IN THE SUPREME COURT OF THE STATE OF IDAHO
Docket No. 47871

ERICK VIRGIL HALL,

    Petitioner-Appellant,

v.

STATE OF IDAHO,

    Respondent.

)
)
)
)
)
)
)
)
)
)
)

Boise, May 2022 Term

Opinion Filed: June 22, 2023

Melanie Gagnepain, Clerk

**SUBSTITUTE OPINION. THE COURT'S PRIOR OPINION DATED MARCH 22, 2023, IS WITHDRAWN.**

---

Appeal from the District Court of the Fourth Judicial District, State of Idaho, Ada County. Steven Hippler, District Judge.

The judgment of the district court is <u>affirmed</u>.

Ferguson Durham, PLLS, Boise, for Appellant, Erick Virgil Hall. Craig H. Durham argued.

Raúl R. Labrador, Idaho Attorney General, Boise, for Respondent, State of Idaho. L. LaMont Anderson argued.

---

STEGNER, Justice.

Erick Hall appeals from the district court's dismissal of his successive petition for post-conviction relief regarding his death sentence, which he received for the murder of Lynn Henneman in September 2000. In a consolidated direct and post-conviction appeal, this Court affirmed Hall's death sentence. *State v. Hall*, 163 Idaho 744, 419 P.3d 1042 (2018).

Hall then filed a successive petition for post-conviction relief, asserting that his appellate counsel had been ineffective for failing to raise certain claims related to the guilt and sentencing phases of his original trial in his first petition for post-conviction relief. Hall further asserted that the district court presiding over the original petition for post-conviction relief committed several reversible errors that appellate counsel failed to raise on appeal to this Court. The district court dismissed Hall's successive petition in its entirety. For the reasons discussed below, we affirm.

# I. FACTUAL AND PROCEDURAL BACKGROUND

Hall once again appeals to this Court. *See e.g., Hall v. State*, 151 Idaho 42, 253 P.3d 716 (2011) (*Hall I*); *State v. Hall*, 163 Idaho 744, 419 P.3d 1042 (2018) (*Hall II*). These cases all stem from Hall's 2004 conviction for the kidnapping, rape, and murder of flight attendant Lynn Henneman. *Hall II*, 163 Idaho at 765–66, 419 P.3d at 1063–64. The jury sentenced Hall to death. *Id.* at 766, 419 P.3d at 1064.

Hall directly appealed to the Idaho Supreme Court, and he also simultaneously brought a petition for post-conviction relief in district court. Hall's direct appeal and his post-conviction petition were brought at the same time because Idaho law requires both to be pursued together. *Id.* The district court granted the State's motion for summary dismissal of the petition for post-conviction relief, which Hall also appealed. *Id.* This Court consolidated Hall's two appeals and "affirm[ed] the district court's judgments of conviction and sentences, and its order dismissing Hall's petition for post-conviction relief." *Id.* at 834–35, 419 P.3d at 1132–33.

Hall filed a successive petition for post-conviction relief in district court on August 6, 2018. He then filed a "Second Amended Successive Petition for Post-Conviction Relief" in March of 2019, in which he "set[] forth several claims of ineffective assistance of appellate counsel and corresponding substantive claims." The State moved for summary dismissal, which the district court granted on February 12, 2020. Hall timely appealed.

# II. STANDARD OF REVIEW

"Proceedings for post-conviction relief are civil in nature, rather than criminal, and the applicant must therefore prove the allegations in the request for relief by a preponderance of the evidence." *Dunlap v. State*, 159 Idaho 280, 294–95, 360 P.3d 289, 303–04 (2015) (*Dunlap VI*) (quoting *State v. Dunlap*, 155 Idaho 345, 361, 313 P.3d 1, 17 (2013) (*Dunlap V*)). The Idaho Supreme Court reviews a district court's refusal to take judicial notice for an abuse of discretion. *Rome v. State*, 164 Idaho 407, 413, 431 P.3d 242, 248 (2018). This Court likewise reviews the denial of discovery in a post-conviction case for an abuse of discretion. *Hall II*, 163 Idaho at 833, 419 P.3d at 1131. "When reviewing a trial court's decision for abuse of discretion, this Court assesses '[w]hether the trial court: (1) correctly perceived the issue as one of discretion; (2) acted within the outer boundaries of its discretion; (3) acted consistently with the legal standards applicable to the specific choices available to it; and (4) reached its decision by the exercise of

reason.'" *Pizzuto v. State*, 168 Idaho 542, 547, 484 P.3d 823, 828 (2021) (quoting *Lunneborg v. My Fun Life*, 163 Idaho 856, 863, 421 P.3d 187, 194 (2018)) (bracketed alteration in original).

This Court freely reviews the summary dismissal of a petition for post-conviction relief. *Dunlap VI*, 159 Idaho at 294–95, 360 P.3d at 303–04. "'In determining whether a motion for summary disposition is properly granted,' this Court applies the same standard as the trial court and 'must review the facts in a light most favorable to the petitioner, and determine whether they would entitle petitioner to relief if accepted as true.'" *Id.* (quoting *Charboneau v. State*, 140 Idaho 789, 793, 102 P.3d 1108, 1112 (2004)). "When a genuine issue of material fact is shown to exist, an evidentiary hearing must be conducted." *Id.* (quoting *Dunlap V*, 155 Idaho at 361, 313 P.3d at 17). However, "the [C]ourt is not required to accept either the applicant's mere conclusory allegations, unsupported by admissible evidence, or the applicant's conclusions of law." *Id.* (quoting *State v. Payne*, 146 Idaho 548, 561, 199 P.3d 123, 136 (2008)).

### III. ANALYSIS

#### A. Hall has waived any argument that the district court erred in declining to take judicial notice of the entirety of the records in his prior cases.

Hall requested below that the district court take judicial notice of the entirety of the records from his prior appeals before this Court in *Hall I* and *Hall II*. The district court declined to do so. Instead, the district court required the parties to request judicial notice of specific items, reasoning "[t]hat would just cut down on having to take judicial notice of things that just really don't matter[.]"

On appeal, Hall contends this Court may consider the entirety of the records in his prior appeals rather than the individual portions that the district court judicially noticed. The State counters that Hall failed to properly raise this argument in his opening brief; thus, this Court may only consider the portions of the records that were judicially noticed.

We agree with the State. As noted by the State, Hall only raised the issue in a footnote, stating:

> To the extent that Mr. Hall cites any documents here that are arguably not part of the record below, he asserts that the district court erred in declining to take judicial notice of all of the materials in the cases listed above pursuant to Idaho Rule of Evidence ("I.R.E.") 201. Mr. Hall will elaborate on the point in his reply brief should the State take issue with the scope of the record.

Hall provides no other argument or authority in his opening brief supporting his position that the Court may consider materials that were not judicially noticed by the district court. Rather, he

3

waited until his reply brief to argue that the district court "erred as a matter of law in refusing to take judicial notice of" the prior records. "Issues on appeal that are not supported by propositions of law or authority are deemed waived and will not be considered by the Supreme Court." *Suitts v. Nix*, 141 Idaho 706, 708, 117 P.3d 120, 122 (2005). "[T]his Court will not consider arguments raised for the first time in the appellant's reply brief." *Id.* (quoting *Myers v. Workmen's Auto Ins. Co.*, 140 Idaho 495, 508, 95 P.3d 977, 990 (2004)). "A reviewing court looks only to the initial brief on appeal for the issues presented because those are the arguments and authority to which the respondent has an opportunity to respond in the respondent's brief." *Id.*

In his opening brief, Hall simply "asserts that the district court erred" without reasoning or citations to authority, promising to "elaborate on the point in his reply brief[.]" This effectively deprived the State of its opportunity to respond. While the State was aware that this may have been an issue, it was unable to respond to the six and a half pages Hall dedicated to specific arguments in his reply brief. Regardless of the merits of the district court's decision not to take judicial notice of the records in Hall's prior cases, we conclude that the judicial notice issue is not properly before this Court, and Hall has waived his argument.

## B. Hall has waived any argument that the district court erred in denying his third motion for discovery.

Hall next challenges the district court's denial of his third motion for discovery.[1] At trial, the jury was shown a video recording of an interrogation in which Hall "made incriminating statements about the rape and murder of Lynn Henneman." Additionally, during the interrogation "references were made to Hall being in prison and to Hall's prior periods of incarceration." "Veiled references" were also made regarding Hall being charged with a second murder—that of Cheryl Hanlon.

Prior to showing the video to the jury, the State redacted "the prejudicial material and other extraneous discussion[.]" The State had also prepared a transcript, referred to as the "Friday Transcript," in order to aid the jurors in following along with the video. The trial court[2] allowed the State to give the jurors a copy of the Friday Transcript, but gave the following limiting instruction:

---

[1] Hall filed multiple motions for discovery but only challenges the district court's denial of his third motion on appeal.
[2] For clarity, this opinion will refer to the district court (Judge Neville) that presided over Hall's underlying criminal trial as the "trial court," and the district court (Judge Hippler) that presided over Hall's second post-conviction petition, whose decisions Hall now appeals, as the "district court."

4

The audio portion of the video tapes which you're about to see the first of is, at some times, difficult to hear. For that reason the [c]ourt will allow you, while viewing and hearing the video tapes, to read along with copies of quote transcripts closed quote, which have been prepared by law enforcement personnel in order to aid you in understanding what is being said. These transcripts may or may not be accurate or complete at all times. That is for you to judge.

The transcripts are not evidence and you will not have them with you during deliberations. The transcript is being provided to you now only as an aid to understanding the content of the video tape. Any discrepancies between the transcript and what you hear on the audio portion of the video tapes must be resolved in favor of the video tape. The video tapes are evidence and you will have access to them during your deliberations.

One of the prosecutors, Roger Bourne, then played the interrogation video for the jury. However, once it had played partway through Bourne interrupted the playing of the video, stating, "[I]t appears to me that there are some things in the transcript that aren't on the tape. We made some changes in the tape. But looks to me like the transcript isn't tracking exactly." The trial court dismissed the jury early and allowed Bourne to rework the transcript, reasoning:

I know Counsel said they worked late into the evening trying to make this transcript and the tape, as redacted, line up. And it seemed to me like there were maybe two spots where that was not – at least one spot that I may have noticed where that wasn't true. So with more weekend labor I suppose this can be gotten perfect.

At no point did Hall's trial counsel object or otherwise suggest that the Friday Transcript contained anything prejudicial.

When the jurors returned to court the following Monday, they were given a revised version of the transcript. The trial court stated, "With the [c]ourt's instructions to the jury that the video tape is the evidence and the transcript is just intended to be a – merely an aid in using, doesn't seem like we've done any harm here at all. If somebody had a different view I'd like to hear it." Once again, Hall's trial counsel did not object. The interrogation video was again played for the jury. As noted by the district court, "[t]he Friday Transcript [was] not marked or preserved for the official record in any way."

On June 7, 2019, Hall filed his third motion for discovery, requesting that the district court order discovery regarding the Friday Transcript. After three versions of the interrogation transcript were ultimately determined not to be the Friday Transcript, Hall's prior counsel located a fourth transcript that may have been the Friday Transcript. Hall sought "leave to either depose the trial prosecutors or require them to answer written interrogatories regarding whether the recently

obtained version is indeed the Friday Transcript or, if not, whether they recall if any prejudicial material was in [sic] contained in the Friday Transcript."

The district court denied Hall's request for discovery on July 11, 2019. Citing *State v. Wood*, 132 Idaho 88, 967 P.2d 702 (1998), the district court noted that the practice of deposing prosecutors was disfavored. The district court further reasoned that, because Hall's trial counsel never objected to the Friday Transcript or otherwise preserved the alleged error, Hall would have to meet the fundamental error test laid out in *State v. Perry*:

(1) the defendant must demonstrate that one or more of the defendant's unwaived constitutional rights were violated;

(2) the error must be clear or obvious, without the need for any additional information not contained in the appellate record, including information as to whether the failure to object was a tactical decision; [and]

(3) the defendant must demonstrate that the error affected the defendant's substantial rights, meaning (in most instances) that it must have affected the outcome of the trial proceedings.

150 Idaho 209, 226, 245 P.3d 961, 978 (2010). The district court concluded that any error was "not clear or obvious from the record and, therefore, fails the fundamental error test." The district court further concluded that "Hall [] failed to present any evidence that there were prejudicial references that remained in the Friday Transcript and, even if so, that the jurors saw those prejudicial references[,]" rendering his claim speculative.

On appeal, Hall argues that the district court abused its discretion in denying his discovery request. Hall asserts that "there is a high risk that the jury was exposed to prejudicial information about him" via the Friday Transcript, and it is necessary to conduct additional discovery. Hall contends that the district court's reasoning in denying his discovery request was "flawed" for four reasons. First, he argues that the district court's application of *Wood*, 132 Idaho 88, 967 P.2d 702 was inappropriate because the prosecutors he was seeking to depose have since retired and *Wood* did not address interrogatories. Second, Hall asserts that the district court incorrectly concluded that the State Appellate Public Defender's office ("SAPD"), which had served as Hall's counsel during his direct appeal and first petition for post-conviction relief, could not have augmented the appellate record with the Friday Transcript pursuant to Idaho Appellate Rule 30(a). Third, Hall argues that the district court should not have placed any weight on Hall's trial counsel's failure to "object to the jury's exposure to the [Friday Transcript] to infer that it must have been innocuous" because his trial counsel had "sacrificed any claim to the benefit of the doubt by grossly

6

mishandling Mr. Hall's case." Finally, Hall argues that the district court incorrectly deemed his request for discovery a "fishing expedition" because "[h]e is searching for a specific document that was undisputably [sic] in the possession of the prosecution" and "there are particular facts in the record raising the distinct prospect that the transcript had inadmissible and damaging material."

The State responds by noting that although Hall contends the denial of his discovery request violated his constitutional rights, "he fails to explain how" the denial violated either his federal or state constitutional rights. The State argues that the district court did not "actually appl[y]" *Wood* and, even if it did, any reliance on *Wood* would be appropriate because "the principles established in *Wood* are broadly based upon 'the potential difficulties that may arise if counsel may be deposed.'" *Wood*, 132 Idaho at 108, 967 P.2d at 722. The State asserts that Hall is incorrect in his argument that the SAPD could have augmented the record under Idaho Appellate Rule 30(a) because the SAPD could not find the Friday Transcript and, even if it could have, it would have been impossible for a court to sufficiently determine that it was in fact the Friday Transcript. The State further contends that the district court was within its discretion to consider Hall's trial counsel's reaction to the Friday Transcript and points out that the district court also looked to the trial court's reaction as well. Finally, the State argues that Hall's claim is speculative because nothing in the record suggests the jury was exposed to any prejudicial material.

We conclude that the discovery issue was waived. While Hall has challenged the district court's denial of his request for discovery regarding the Friday Transcript issue, he has failed to challenge the district court's summary dismissal of the Friday Transcript issue on the merits. In its Final Order on Motions for Summary Dismissal and Objection to Evidence—which was filed on February 12, 2020, more than seven months after the district court denied Hall's discovery request—the district court explicitly ruled that the Friday Transcript "claim is speculative and fails to satisfy fundamental error." The district court explained:

> Moreover, even if Hall could establish that the jury was exposed to prejudicial material in the Friday Transcript, he cannot establish the first *Perry* prong, i.e., that such exposure violated an unwaived constitutional right. *Perry*, 150 Idaho at 226, 245 P.3d at 978. Any error here would have been a violation of I.R.E. 404(b), which disallows evidence of other crimes, wrongs or acts to prove a person's character in order to show that the person acted in conformity therewith. However, evidentiary errors do not invoke the fundamental error doctrine because they "are not of constitutional import." *State v. Norton*, 151 Idaho 176, 182, 254 P.3d 77, 83 (Ct. App. 2011). At issue in *Norton* was whether the State's introduction of evidence of other crimes, wrongs or acts in violation of I.R.E. 404(b) was fundamental error.

7

*Id.* In her appeal, the defendant claimed that the alleged evidentiary errors violated her state and federal constitutional due process rights to a fair trial and fair tribunal. *Id.* The Court of Appeals rejected the argument out of hand, noting that even though the defendant claimed constitutional violations, her claims were grounded in violations of the rules of evidence, which do not invoke fundamental error. *Id.* at 182–83, 254 P.3d at 83–84 ("This Court will not entertain attempts to characterize alleged evidentiary errors, to which no objection was made at trial, as a due process violation of the right to a fair trial in a fair tribunal.").

Likewise, Hall alleges that the jury's exposure to the Friday Transcript violated his right to due process, to a fair trial and to an impartial jury. However, under *Norton*, this allegation is untenable because evidentiary error is not a constitutional violation and, therefore, does not amount to fundamental error. Thus, *even if the [c]ourt accepted as true Hall's baseless speculation that the jury was exposed to prejudicial material in the Friday Transcript, his claim would still lack merit on appeal because he could not establish fundamental error*.

(Italics added; internal record citation omitted.) The district court then concluded that summary dismissal of Hall's Friday Transcript claim was appropriate.

In his opening brief, Hall contends that "the transcript issue that appellate counsel should have argued is based on a defendant's right to due process, to a fair trial, to an impartial jury, and to the principles codified by Idaho Rule of Evidence 404, all of which are violated when the jury is exposed to prejudicial material about alleged prior bad acts that is not properly in evidence." However, at no point in his opening brief does he challenge the district court's summary dismissal of his Friday Transcript claim, nor does he make any attempt to address the district court's conclusion that the Friday Transcript claim does not implicate constitutional rights pursuant to *Norton*. Because he has not challenged the district court's conclusion that the Friday Transcript claim cannot meet the fundamental error test, this claim has been waived and this Court is without the authority to reverse the district court's decision to summarily dismiss the claim. *See Suitts*, 141 Idaho at 708, 117 P.3d at 122 ("Issues on appeal that are not supported by propositions of law or authority are deemed waived and will not be considered by the Supreme Court.").

Thus, even if the district court erred in denying Hall's discovery request, Hall's failure to challenge the summary dismissal of the Friday Transcript claim renders the discovery issue waived as well. Remedying any such error by ordering discovery would simply allow discovery for the sake of discovery; even if the discovery attempt were fruitful, Hall would still be unable to succeed on his Friday Transcript claim because it has already been dismissed. Accordingly, we conclude that the discovery issue was waived. Therefore, we need not address Hall's contention that the district court erred in denying his third motion for discovery.

**C. The district court did not err in dismissing Hall's successive petition for post-conviction relief.**

Hall raises multiple claims arguing his appellate counsel provided him with ineffective assistance during the guilt and sentencing phases of his trial, as well as during his first petition for post-conviction relief. "The right to counsel in criminal actions brought by the state of Idaho is guaranteed by the Sixth Amendment to the United States Constitution and Article 1, Section 13 of the Idaho State Constitution." *Dunlap VI*, 159 Idaho at 295, 360 P.3d at 304 (quoting *Murray v. State*, 156 Idaho 159, 164, 321 P.3d 709, 714 (2014)). "[T]he right to counsel is the right to the effective assistance of counsel." *Id.* (alteration in original). "[D]efendants have a right to effective assistance of counsel on appeal[.]" *Id.* at 296, 360 P.3d at 305 (quoting *Lafler v. Cooper*, 566 U.S. 156, 164 (2012)) (first alteration in original).

This Court evaluates ineffective assistance of appellate counsel claims under the test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *Dunlap VI*, 159 Idaho at 296, 360 P.3d at 305. "To prevail under *Strickland*, the petitioner must show: (1) 'that counsel's performance was deficient,' and (2) 'that the deficient performance prejudiced the defense.'" *Id.* (quoting *Strickland*, 466 U.S. at 687). "Thus, '[i]n order to survive a motion for summary dismissal, post-conviction relief claims based upon ineffective assistance of counsel must establish "the existence of material issues of fact as to"' both *Strickland* prongs." *Id.* (quoting *Dunlap V*, 155 Idaho at 383, 313 P.3d at 39) (alteration in original).

"To prove counsel's performance was deficient, 'the defendant must show that counsel's representation fell below an objective standard of reasonableness.'" *Id.* (quoting *Strickland*, 466 U.S. at 688). "'In doing so, the defendant must overcome a strong presumption that counsel was competent and diligent in his or her representation of the defendant,' and that counsel 'made all significant decisions in the exercise of reasonable professional judgment.'" *Id.* (quoting *Booth v. State*, 151 Idaho 612, 617, 262 P.3d 255, 260 (2011) then *Strickland*, 466 U.S. at 690). "To overcome that presumption, a defendant must show that counsel failed to act 'reasonabl[y] considering all the circumstances.'" *Id.* (quoting *Cullen v. Pinholster*, 563 U.S. 170 (2011)) (alteration in original). "[S]trategic and tactical decisions will not be second guessed or serve as a basis for post-conviction relief under a claim of ineffective assistance of counsel unless the decision is shown to have resulted from inadequate preparation, ignorance of the relevant law or other shortcomings capable of objective review." *Id.* (quoting *Dunlap V*, 155 Idaho at 386, 313 P.3d at 42) (alteration in original). "Importantly, '[a] fair assessment of attorney performance

9

requires that every effort be made to eliminate the distorting effects of hindsight,' and counsel's conduct must be evaluated 'from counsel's perspective at the time.'" *Id.* (quoting *Strickland*, 466 U.S. at 689) (alteration in original).

"To demonstrate deficient performance of appellate counsel for failure to raise a claim on appeal, the defendant must show that counsel made an objectively unreasonable decision to omit the claim." *Id.* (citing *Smith v. Robbins*, 528 U.S. 259, 288 (2000)). "Courts have recognized that appellate counsel may fail to raise an issue on appeal because counsel 'foresees little or no likelihood of success on that issue; indeed, the weeding out of weaker issues is widely recognized as one of the hallmarks of effective appellate advocacy.'" *Id.* (quoting *Miller v. Keeney*, 882 F.2d 1428, 1434 (9th Cir. 1989)). "Appellate counsel is not deficient for using reasonable professional judgment in deciding the most promising issues for appellate review and counsel is not required to raise issues which are reasonably considered to be meritless." *Id.* "Indeed, 'appellate counsel who files a merits brief need not (and should not) raise every nonfrivolous claim, but rather may select from among them in order to maximize the likelihood of success on appeal.'" *Id.* (quoting *Robbins*, 528 U.S. at 288). "[G]enerally, only when ignored issues are clearly stronger than those presented, will the presumption of effective assistance of counsel be overcome."[3] *Id.*

"To prove that counsel's deficient performance prejudiced the defendant, '[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Id.* at 297, 360 P.3d at 306 (quoting *Strickland*, 466 U.S. at 694). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* (quoting *Dunlap V*, 155 Idaho at 383, 313 P.3d at 39). "This 'requires a substantial, not just conceivable, likelihood of a different result.'" *Id.* "When reviewing appellate counsel's performance, we determine whether, but for appellate counsel's errors, a reasonable probability exists that the defendant would have prevailed on appeal." *Id.*

---

[3] Hall requests that, rather than comparing omitted claims to the claims that were brought by appellate counsel, the Court "adopt the rule that when 'appellate counsel fails to raise a claim on appeal that is so obviously valid that any competent lawyer would have raised it, no further evidence is needed to determine whether counsel was ineffective for not having done so.'" *Eagle v. Linahan*, 279 F.3d 926, 943 (11th Cir. 2001). It is unclear how Hall's proposed rule would operate differently from established precedent. For example, if Hall is correct and one of the claims on appeal now is a "dead-bang winner," *see Banks v. Reynolds*, 54 F.3d 1508, 1515 (10th Cir. 1995) (quoting *United States v. Cook*, 45 F.3d 388, 394 (10th Cir. 1995)), that claim would necessarily be stronger than any claim brought by the SAPD in *Hall II* because Hall did not prevail on any claims brought in *Hall II*. Additionally, as Hall states in his reply brief, "Reasonableness is the touchstone of deficient performance." We decline Hall's invitation to carve out a special rule, particularly when he has failed to give more than a passing reference as to why his proposed rule is "more faithful to the animating principle in *Strickland*" in his opening brief.

"[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies." *Id.* (quoting *Strickland*, 466 U.S. at 697) (alteration in original). "Thus, 'there is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one.'" *Id.* "The United States Supreme Court has stated: 'If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.'" *Id.*

### 1. The guilt phase issues

On appeal, Hall challenges the district court's dismissal of his claims regarding the guilt-phase of his capital trial. As discussed below, we hold that the district court did not err in dismissing Hall's guilt-phase claims.

#### i. *The district court did not err when it dismissed Hall's* Witherspoon *claim.*

Prior to jury selection, each potential juror was "asked to complete a twenty-six paged [sic] juror questionnaire, which included twenty-one questions specific to how they felt about the death penalty." The questionnaire included a question (Question 113) which asked the jurors to circle one statement from the following five options that "best represent[ed] their feelings about the death penalty:"

a. I believe that the death penalty is appropriate in all murder cases.

b. I believe that the death penalty is appropriate in some murder cases and I could return a verdict in a proper case which assessed the death penalty.

c. Although I do not believe that the death penalty ever ought to be invoked, as long as the law provides for it, I could assess it under the proper set of circumstances.

d. I believe that the death penalty is appropriate in some murder cases, but I could never return a verdict which assessed the death penalty.

e. I could never, under any circumstances, return a verdict which assessed the death penalty.

Nine jurors—jurors 4, 10, 18, 20, 23, 33, 47, 53, and 92—selected option "e." During limited *voir dire*, the trial court confirmed with the jurors that they remained committed to their answer. Hall's trial counsel stipulated to excusing all nine jurors for cause.

11

During a panel session in which another dismissed juror, Juror 56, was seated, the trial court asked, "Does anybody know of any reason why you cannot sit as a fair and impartial juror in this case?" Juror 56—who had selected option "b" to Question 113—raised her hand. The trial court then asked follow-up questions in individual *voir dire*, and Juror 56 confirmed that her "problem [was] with voting for the death penalty[.]" Juror 56 explained that she would have a problem voting to impose the death penalty because she "just [did]n't want to basically have somebody else['s] life on [her] hands." She indicated that she "could not handle [] being in that position[.]" The trial court then gave counsel the opportunity to ask questions of Juror 56; both sides refused and instead stipulated to her being excused. The SAPD did not appeal any of the ten jurors being excused.

In his successive petition for post-conviction relief, Hall alleged that the SAPD should have challenged the dismissal of all ten jurors under *Witherspoon v. Illinois*, 391 U.S. 510 (1968). In *Witherspoon*, the United States Supreme Court held "that a sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction." 391 U.S. at 521. The district court dismissed Hall's *Witherspoon* claim. The district court concluded that, because Hall's trial counsel stipulated to the dismissal of all ten jurors, any error was invited and could not have been successfully challenged by the SAPD. The district court further found that "even if Hall's *Witherspoon* claim were considered on the merits, the record demonstrates that the trial court did not abuse its discretion in excusing the jurors."

On appeal, Hall argues that the district court improperly relied on his trial counsel's stipulation to dismiss the jurors. He further contends that the district court erred in dismissing his claim on the merits. He argues that Juror 56 should not have been dismissed because her equivocation simply amounted to a reluctance to impose the death penalty, which is not enough for dismissal under *Witherspoon*. Likewise, he contends the other nine jurors should not have been dismissed because the trial court should have engaged in more meaningful *voir dire* and not simply relied on their answers to Question 113.

The State responds that any error was invited due to Hall's trial counsel's stipulations to dismiss the jurors. The State also argues that Juror 56's equivocal answers in *voir dire* represented a substantial impairment in her ability to perform her duty as a juror, and thus she was correctly

excluded for cause. As to the other nine jurors, the State contends that the trial court focused on the entirety of the juror questionnaires, not just Question 113, and that each juror was properly excluded for cause.

We conclude the district court correctly determined any alleged *Witherspoon* error was invited.

> The invited error doctrine precludes a criminal defendant from "consciously" inviting district court action and then successfully claiming those actions are erroneous on appeal. *State v. Owsley*, 105 Idaho 836, 837, 673 P.2d 436, 437 (1983). "It has long been the law in Idaho that one may not successfully complain of errors one has acquiesced in or invited. Errors consented to, acquiesced in, or invited are not reversible." *Id.* at 838, 673 P.2d at 438 (citation omitted); *see also* [*Dunlap V*], 155 Idaho 345, 379, 313 P.3d 1, 35 (2013) (applying invited error to a capital case).

*State v. Abdullah*, 158 Idaho 386, 420–21, 348 P.3d 1, 35–36 (2015). Citing *Abdullah*, 158 Idaho at 420–21, 348 P.3d at 35–36 and *Dunlap VI*, 159 Idaho at 307, 360 P.3d at 316, Hall contends this Court has inconsistently applied the doctrine of invited error in cases where defense counsel have failed to object to the final seated jury. However, as the State points out, Hall's trial counsel not only failed to object but actively stipulated to the dismissal of all the jurors Hall now argues were improperly removed under *Witherspoon*. If a district court accepts a stipulation agreed upon by both parties, "the error, if any, was invited." *State v. Dempsey*, 169 Idaho 19, 33, 490 P.3d 19, 33 (2021).

Additionally, contrary to Hall's contention, exclusion of a juror under *Witherspoon* does not implicate that juror's constitutional rights. Citing *State v. Livingston*, 220 S.W.3d 783, 790 (Mo. Ct. App. 2007), Hall argues that "stipulations cannot eradicate a *Witherspoon* error" because a potential juror's constitutional "rights are violated in addition to the defendant's." However, *Livingston* involved the racially-motivated exclusion of a juror, which violated that juror's constitutional rights under *Batson v. Kentucky*, 476 U.S. 79, 87 (1986). 220 S.W.3d at 790 ("[A]s a matter of constitutional right and fundamental equality, an African–American has a right to serve on a jury that can only be impaired for cause or legitimate and rational reason through a preemptory [sic] strike."). The *Livingston* opinion does not even cite *Witherspoon*. 220 S.W.3d at 783–91.

Furthermore, central to the Supreme Court's decision in *Batson* was the idea that "[c]ompetence to serve as a juror ultimately depends on an assessment of individual qualifications and ability impartially to consider evidence presented at a trial." 476 U.S. at 87. "A person's race simply 'is unrelated to his fitness as a juror.'" *Id.* (quoting *Thiel v. S. Pacific Co.*, 328 U.S. 217,

13

227 (1946)). However, if a juror is excludable for cause under *Witherspoon*, that juror's views on the death penalty directly implicate his or her competence to serve on a jury in a capital case. *Lockhart v. McCree*, 476, 162, 175–76 (1986). "[T]he group of '*Witherspoon*-excludables' includes only those who cannot and will not conscientiously obey the law with respect to one of the issues in a capital case[.]" *Id.* at 176. The Supreme Court has explained:

> [T]he removal for cause of "*Witherspoon*-excludables" in capital cases does not prevent them from serving as jurors in other criminal cases, and thus *leads to no substantial deprivation of their basic rights of citizenship*. They are treated no differently than any juror who expresses the view that he would be unable to follow the law in a particular case.

*Id.* (italics added). Thus, we conclude the invited error doctrine applies to alleged *Witherspoon* errors. Because Hall invited any error when he stipulated to the exclusion of all the jurors he now argues were improperly removed under *Witherspoon*, he has failed to show that there is a reasonable probability that, but for the SAPD's failure to appeal the excusals, the result of his direct appeal would have been different. Because he has not established he was prejudiced by the SAPD's performance, we hold that the district court did not err in dismissing Hall's *Witherspoon* claim.

### ii. The district court did not err when it dismissed Hall's coercive interrogation claim.

Hall was interrogated by police three times: on March 13, 2003, on March 29, 2003, and on April 1, 2003. In the interrogation with police officers on April 1, 2003, Hall made incriminating statements regarding the Henneman murder and "also wrote an apology letter to Ms. Henneman's family seeking forgiveness for 'the wrong' he had done." Prior to trial, Hall moved to suppress the incriminating statements and the letter "on grounds that they were coerced and involuntary." The trial court denied his motion. A video recording of the incriminating statements was played for the jury during the guilt-phase of the trial and the letter was admitted into evidence.

The SAPD did not appeal the trial court's ruling on the motion to suppress. In his successive amended petition, Hall alleged his appellate counsel were deficient for failing to challenge the ruling. The district court summarily dismissed the claim. The district court concluded that Hall had failed to present a prima facie claim for relief and had likewise failed to establish "that the outcome of the appeal would have been different."

On appeal, Hall argues that the district court erred in dismissing his coercive interrogation claim because, had his appellate counsel brought the claim, it is reasonably likely this Court would

14

have granted relief in the consolidated appeal. Hall asserts that, under the totality of the circumstances relating to the interrogation, his will was overborne by police such that the incriminating statements were not made voluntarily. Hall points to twelve factors that render his interrogation coercive: (1) his childhood experience of abuse; (2) his depression; (3) his "extensive history" of drug and alcohol use; (4) his lack of sleep prior to the March 29, 2003, interrogation; (5) his lack of "intellectual wherewithal to stand up to an aggressive interrogation"; (6) the "small" and "windowless" interrogation room; (7) that two middle-aged, male officers sat in close proximity to Hall—who was "considerably" smaller than the officers—throughout the interrogations; (8) that officers "fed" Hall details of the crime; (9) that officers "mischaracterized" the law during the interrogation; (10) the length of the interrogations; (11) that officers "browbeat[]" Hall "with the notion that he would be giving closure to the victim's family by confessing"; and (12) that the officers "made inappropriate[] religious appeals[.]" Hall contends that, had his appellate counsel made these arguments, the State would have been unable to meet its burden under the harmless error test this Court would have applied.

The State responds that Hall is raising new arguments on appeal because his original motion to suppress did not contain all twelve of Hall's totality of the circumstances factors. Regardless, the State argues that, even if all twelve of Hall's current arguments are considered by this Court, his claim still fails. The State contends that there was no "outrageous conduct" by any of the officers that interrogated Hall, and further points out that Hall was given his *Miranda* rights before each interrogation. Additionally, the State posits, "Hall was not particularly young nor was he new to the criminal justice system." Therefore, the State argues that the totality of the circumstances show that the statements and letter occurred voluntarily.

We agree with the State that Hall has failed to preserve many of the arguments he now asserts appellate counsel should have made on direct appeal. Pointing to *United States v. Guzman-Padilla*, Hall contends that "it is claims that are deemed waived or forfeited, not arguments." 573 F.3d 865, 877 n.1 (9th Cir. 2009). He argues that he may "polish" his coercive interrogation claim with additional facts that were not before the trial court. However, as it is an opinion from a United States Court of Appeals, *Guzman-Padilla*, while generally considered persuasive authority, is not binding on this Court. *See State v. McNeely*, 162 Idaho 413, 416, 398 P.3d 146, 149 (2017) ("[S]tate courts are not bound by circuit court precedent even on matters of federal law."). Furthermore, "[t]his Court has made clear that a central rule of appellate review is that '[t]his Court

15

will not consider issues raised for the first time on appeal.'" *State v. Hoskins*, 165 Idaho 217, 221–22, 443 P.3d 231, 235–36 (2019) (quoting *State v. Garcia-Rodriguez*, 162 Idaho 271, 275, 396 P.3d 700, 704 (2017)). "To properly preserve an issue for appellate review, 'both the issue and the party's position on the issue must be raised before the trial court[.]'" *Id.* at 222, 443 P.3d at 236 (quoting *State v. Gonzalez*, 165 Idaho 95, 99, 439 P.3d 1267, 1271 (2019)). "[I]t would be 'inappropriate for this Court to rule that the district court erred by not considering *evidence or argument* not presented to it.'" *Id.* at 225, 443 P.3d at 239 (quoting *Gonzalez*, 165 Idaho at 100, 439 P.3d at 1272) (italics added).

Any arguments Hall did not present to the trial court during his motion to suppress would not have been preserved on appeal had the SAPD brought the claim, and he cannot now contend his appellate counsel were ineffective in failing to raise unpreserved arguments on appeal. The district court summarized the situation:

> Hall's trial counsel did not raise any of Hall's "vulnerabilities" (i.e., drug abuse; lack of sleep; lack of intelligence; childhood trauma) in his motion to suppress, nor did he argue at that time that the officers improperly fed him details of the crime, mischaracterized the law in the manner argued by Hall here or improperly appealed to his religion. What was raised in Hall's motion to suppress was the size of the interrogation room, whether the officers were physically imposing, whether Hall was provided adequate nutrition and the ability to use the facilities, and whether the deception used by law enforcement in questioning him (i.e., mentioning Hall's wife and unborn child, indicating that he would be giving closure to the Henneman family through the letter) was appropriate.

Hall does not take issue with the district court's characterization as to which of his current arguments were presented during his motion to suppress and thus would have been preserved on direct appeal. Therefore, we will focus only on the issues the district court identified as having been preserved that Hall also presents to this Court during the current appeal. There are only two: "the size of the interrogation room" and "whether the officers were physically imposing[.]"

Had the SAPD appealed the trial court's denial of Hall's motion to suppress, this Court would have applied a bifurcated standard of review. "This Court will accept the trial court's findings of fact unless they are clearly erroneous. However, this Court may freely review the trial court's application of constitutional principles in light of the facts found." *State v. Andersen*, 164 Idaho 309, 312, 429 P.3d 850, 853 (2018) (quoting *State v. Purdum*, 147 Idaho 206, 207, 207 P.3d 182, 183 (2009)). "The deference to the trial court's factual findings reflects 'the trial court's

16

special role to weigh conflicting evidence and judge the credibility of witnesses.'" *Id.* (quoting *Hull v. Giesler*, 163 Idaho 247, 250, 409 P.3d 827, 830 (2018)).

> "When a defendant alleges an interrogation to be coercive, the State bears the burden of proving voluntariness of the defendant's confession by a preponderance of the evidence." *State v. Yager*, 139 Idaho 680, 685, 85 P.3d 656, 661 (2004) (citing *Lego v. Twomey*, 404 U.S. 477, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972)). To determine the voluntariness of a statement, courts examine the totality of the circumstances to determine "whether the defendant's will was overborne." *Id.* The Court has outlined the following factors to be considered in determining whether a confession was voluntary: "(1) Whether *Miranda* warnings were given; (2) The youth of the accused; (3) The accused's level of education or low intelligence; (4) The length of detention; (5) The repeated and prolonged nature of the questioning; and (6) Deprivation of food or sleep." *State v. Radford*, 134 Idaho 187, 191, 998 P.2d 80, 84 (2000) (quoting *State v. Troy*, 124 Idaho 211, 214, 858 P.2d 750, 753 (1993)); *see also Schneckloth v. Bustamonte*, 412 U.S. 218, 226, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). The presence of *Miranda* warnings is a particularly significant factor. *Missouri v. Seibert*, 542 U.S. 600, 608–09, 124 S.Ct. 2601, 159 L.Ed.2d 643 (2004).

*Id.* at 314, 429 P.3d at 855. The six-factor test is not an exhaustive list of all factors that may be considered. *See Troy*, 124 Idaho at 214, 858 P.2d at 753 (stating that, "[i]n determining the voluntariness of a confession, a court must look to the characteristics of the accused and the details of the interrogation, *including* the" six factors (italics added)).

It should first be noted that Hall has not alleged the trial court's findings of facts were clearly erroneous, nor has he challenged the district court's characterization of the trial court's factual findings. The trial court explicitly found that *Miranda* warnings were given prior to all three of Hall's interviews with police; Hall was thirty-two years old; "[t]here was no indication from the dialogue of evidence that [Hall] was of low intelligence"; the interviews were not "overly long"; and Hall was not deprived of food or sleep. Thus, five of the six factors weigh in favor of voluntariness.

As to the size of the interrogation room, Hall argues that "[t]he room where the first two interrogations took place was only eight feet by ten feet." He points to *Reck v. Pate*, 367 U.S. 433, 441 (1991), in which a defendant's confession was deemed involuntary because he was interrogated in a "windowless 'handball court[.]'" Hall's reliance on *Reck* is misplaced. The interrogation room in *Reck* was part of the totality of the circumstances analysis—circumstances much worse than any Hall alleges occurred here—that rendered the confession involuntary. *See Reck*, 367 U.S. at 441–42. The United States Supreme Court explained:

17

At the time of his arrest Reck was a nineteen-year-old youth of subnormal intelligence. He had no prior criminal record or experience with the police. He was held nearly eight days without a judicial hearing. Four of those days preceded his first confession. During that period Reck was subjected each day to six- or seven-hour stretches of relentless and incessant interrogation. The questioning was conducted by groups of officers. For the first three days the interrogation ranged over a wide variety of crimes. On the night of the third day of his detention the interrogation turned to the crime for which petitioner stands convicted. During this same four-day period he was shuttled back and forth between police stations and interrogation rooms. In addition, Reck was intermittently placed on public exhibition in 'show-ups.' On the night before his confession, petitioner became ill while on display in such a 'show-up.' He was taken to the hospital, returned to the police station and put back on public display. When he again became ill he was removed from the 'show-up,' but interrogation in the windowless 'handball court' continued relentlessly until he grew faint and vomited blood on the floor. Once more he was taken to the hospital, where he spent the night under the influence of drugs. The next morning he was removed from the hospital in a wheel chair, and intensive interrogation was immediately resumed. Some eight hours later Reck signed his first confession. The next afternoon he signed a second.

During the entire period preceding his confessions Reck was without adequate food, without counsel, and without the assistance of family or friends. He was, for all practical purposes, held incommunicado. He was physically weakened and in intense pain. We conclude that *this total combination of circumstances* 'is so inherently coercive that its very existence is irreconcilable with the possession of mental freedom by a lone suspect against whom its full coercive force is brought to bear.' *Ashcraft v. State of Tennessee*, 322 U.S. 143, 154, 64 S.Ct. 921, 926, 88 L.Ed. 1192.

*Id.* (italics added). Thus, the fact that the defendant in *Reck* was interrogated in a windowless room was a small factor in the totality of the circumstances analysis. *Id.*

Additionally, Hall makes no argument as to the size of the interrogation room during the April 1, 2003, interview, the interview in which he made the incriminating statements and wrote his apology letter. While the conditions of prior interviews may be relevant to the voluntariness analysis, *see Reck*, 367 U.S. at 441–42, Hall fails to explain how the small, windowless interrogation room from the two prior interviews renders his April 1 interview coercive.

As to the officers' physically imposing statures, Hall explains that he found it "upsetting" that the middle-aged, male officers invaded his space when they "cornered [him] against the wall" and "loom[ed] over him" and that he told the officers as much during his interview. The State concedes that the officers admitted they moved their chairs close to Hall to make him "uncomfortable" during the interrogation. However, the trial court found that "[a]lthough the detective in the first interview moved his chair closer to Hall, his words were not overbearing,

18

loud[,] or intimidating." Again, Hall has not challenged the trial court's characterization of these facts.

Further, the fact that Hall resisted the officers' tactic by informing them that their close presence made him uncomfortable weighs against his contention his will was overborne. *See Andersen*, 164 Idaho at 314, 429 P.3d at 855. In *Andersen*, "the only aspect of the interrogation that present[ed] any concern as to whether [the defendant's] statements were voluntary, apart from the failure to give *Miranda* warnings, was when Sergeant Schneider loudly accused her of lying." *Id.* The Court further explained: "However, during this most heated point of the interaction, Andersen shouted back at the officers, clearly demonstrating that her will was in no way overborne by the officers." *Id.* Thus, Hall standing his ground by informing the officers he was uncomfortable shows his will was not overborne. Notably, the trial court also emphasized that Hall had spent a "significant time in jail" and, therefore, "was not a novice in the criminal justice system[.]" Hall's experience in the criminal justice system, coupled with his standing his ground against the officers, demonstrates that his statements were made voluntarily.

Even if the windowless room and the closeness of the officers weigh in favor of finding Hall's statements and the letter involuntary, these two factors do not tip the scales against the trial court's findings that the other factors weighed against Hall's position: i.e., the *Miranda* warnings were given prior to all three of Hall's interviews with police; Hall was thirty-two years old; "[t]here was no indication from the dialogue of evidence that [Hall] was of low intelligence"; the interviews were not "overly long"; and Hall was not deprived of food or sleep. As noted above, "[t]he presence of *Miranda* warnings is a particularly significant factor." *Andersen*, 164 Idaho at 312, 429 P.3d at 853 (quoting *Seibert*, 542 U.S. at 608–09). Therefore, under Hall's preserved arguments, we conclude he has not established his will was overborne during any of the three interrogations.

Thus, Hall has failed to establish that, had the SAPD directly appealed the denial of his motion to suppress, this Court would have found his statements and the letter involuntary. Therefore, having not found error, this Court never would have reached the question as to whether the error was harmless. *See Perry*, 150 Idaho at 230, 245 P.3d at 982 (stating that "harmless error analysis is inapplicable" where "no error occurred"). As such, Hall has failed to establish that, had the SAPD challenged the allegedly coercive interrogation on direct appeal, the result of the appeal would have been different. Because he has not established he was prejudiced by the SAPD's

19

performance, we hold that the district court did not err in dismissing Hall's coercive interrogation claim.

### iii. The district court did not err when it dismissed Hall's prosecutorial misconduct claim.

In his successive amended petition for post-conviction relief, Hall alleged that his appellate counsel were ineffective for failing to raise two specific prosecutorial misconduct claims: that the prosecutor improperly personalized the victim during opening statements, and that the prosecutor improperly addressed individual jurors during closing argument.[4] The district court summarily dismissed this claim.

On appeal, Hall concedes that there was no objection to either the prosecutor's opening statement or closing argument at trial and, as such, this Court would have reviewed this claim under a fundamental error standard on direct appeal.

> "Where prosecutorial misconduct was not objected to at trial, Idaho appellate courts may only order a reversal when the defendant demonstrates that the violation in question qualifies as fundamental error . . . ." *State v. Perry*, 150 Idaho 209, 227, 245 P.3d 961, 979 (2010). "Fundamental error is error that: '(1) violates one or more of the defendant's unwaived constitutional rights; (2) plainly exists (without the need for any additional information not contained in the appellate record, including information as to whether the failure to object was a tactical decision); and (3) was not harmless.'" *State v. Lankford*, 162 Idaho 477, 494, 399 P.3d 804, 821 (2017) (citing *Perry*, 150 Idaho at 228, 245 P.3d at 980).

*State v. Godwin*, 164 Idaho 903, 926, 436 P.3d 1252, 1275 (2019) (ellipsis in original).

When reviewing alleged prosecutorial misconduct for fundamental error,

> [t]he first question is whether the alleged misconduct violated a constitutional right. "To constitute a due process violation, the prosecutorial misconduct must be 'of sufficient significance to result in the denial of the defendant's right to a fair trial.'" *Greer v. Miller*, 483 U.S. 756, 765, 107 S.Ct. 3102, 97 L.Ed.2d 618 (1987) (quoting *United States v. Bagley*, 473 U.S. 667, 676, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985)). "[I]t is not enough that the prosecutors' remarks were undesirable or even universally condemned." *Darden v. Wainwright*, 477 U.S. 168, 181, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986) (internal quotation marks omitted). Rather, "[t]he relevant question is whether the prosecutors' comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Id.* (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974)).

---

[4] Hall also alleged that the prosecutor improperly referenced a "day of reckoning" during closing arguments; however, he has not challenged the district court's dismissal of this claim on appeal.

*Hall II*, 163 Idaho at 774, 419 P.3d at 1072. Applying this analysis, we will examine each allegation in turn.

### 1. *References to the victim during opening statements*

The prosecution began its opening statement with the following:

> Let me introduce you to Lynn Henneman. Lynn Henneman is from Montana. She was raised there in her parents' home with her big brother Mark and her little sister, Laura.
>
> She [went] to school there, she was married there, she worked there. She worked as a waitress and hostess in local restaurants in Bozeman. But she always looked up because she wanted to fly. She wanted to be a stewardess. And so when the marriage was over she was about 32 in 1994. She moved to Boston. She went to work for TWA, she went to flight school. And when TWA fell on hard times she transferred to United.
>
> She loved United Airlines. She loved to fly, she loved the people, she loved the places. She loved her husband, Walter. She loved her little sister, Laura who she spent hours with on the phone, even though they lived across the country from each other. She loved her nieces and nephews. She was their favorite aunt and she'd buy them stuff when she was in various cities for their birthdays. And she loved art museums.

Hall takes issue with this entire soliloquy.

Relying heavily on *State v. Severson*, 147 Idaho 694, 215 P.3d 414 (2009), the district court dismissed Hall's claim because "the prosecutor's comments here were not made to appeal to the jury's sympathies but to explain the evidence the jurors were going to hear." The district court concluded that, "[b]ecause the prosecutor's comments were proper, there was no due process violation and, therefore, Hall would not have been able to satisfy the fundamental error test had the claim been raised on appeal." The district court further noted that, even if the comments were improper, the trial court had instructed the jury that "statements of counsel are not evidence," which rendered any error harmless.

On appeal, Hall argues that although some of the prosecutor's comments did refer to evidence later elicited at trial, "those facts could have been referred to in an objective manner without getting into the victim's personal and emotional qualities." Hall contends that the prosecution intended to "convince the jury to identify with the victim" and "play[ed] on the emotions of the jury" "[b]y dwelling on the personal, positive characteristics of the victim and her family[.]" Hall further argues that the comments were additionally prejudicial due to "the intense

21

media coverage of both the Henneman case and the Hanlon case" because "there was already a high risk of jurors voting based on disgust at the crime and sympathy for the victim[.]"

The State responds that the district court correctly determined that the prosecutor's comments were relevant to evidence later revealed at trial. The comments were also relevant, the State argues, to the prosecution's need to prove Hall had killed a human being under Idaho's criminal homicide statute, Idaho Code section 18–4001. The State additionally posits that the comments here were "much less egregious than those in *Severson*," 147 Idaho at 720, 215 P.3d at 440. The State further asserts that, even if the comments were erroneous, the evidence at trial overwhelmingly supported Hall's guilt and the trial court gave the jury instructions to only consider evidence, not counsels' arguments. All things considered, the State argues, Hall has failed to establish fundamental error.

We hold that Hall has failed to establish the prosecutor's comments amounted to misconduct. As Hall concedes, several of the prosecutor's comments related to evidence relevant to the trial, such as the fact that Henneman was newly married and a stewardess. Additionally, Henneman purchased gifts for her nieces and nephews at the Boise Art Museum the night of the murder; the receipts of those purchases also came in at trial. While those facts could have been referred to in a more objective manner, "[g]eneric information about a victim may be relevant to establishing that a victim is more than a nameless, faceless statistic." *State v. Garcia*, 166 Idaho 661, 672, 462 P.3d 1125, 1136 (2020) (holding a spouse's testimony about what she and the victim "enjoyed doing together" was "admissible background information about the victim"). Thus, the comments were not improper, and therefore were not misconduct on the part of the prosecutor.

The comment that Henneman was the "favorite aunt" of her young nieces and nephews is perhaps the most concerning comment the prosecutor made. However, even if this comment was erroneous, any error was harmless. In *Garcia*, the victim's spouse testified that the victim "was 'the most amazing person you'll ever meet[,]' 'a very kind person,' [] 'somebody that was always willing to help people at all times[,]'" and that he "'took care of [her] like no one ever did[.]'" 166 Idaho at 672–73, 462 P.3d at 1136–37. This Court held that it was error to admit the testimony, but that the error was harmless due to the probative force of the other evidence elicited at trial. *Id.* at 675–76, 462 P.3d at 1139–40. Notably, the Court analyzed the testimony in *Garcia* under a harmless error standard—a less burdensome standard than the fundamental error standard under

which we must analyze Hall's claim—and the Court still found no prejudice. Here, the references to Henneman's character and family are significantly less egregious than the testimony in *Garcia*.

*Severson*, relied upon by both the district court and the State, also warrants a brief discussion. In *Severson*, the prosecutor made references to the victim's family on rebuttal during closing statements:

> "Mary Severson isn't a decedent. Mary Severson was the 35–year–old mother of two boys. Mary Severson was the daughter of Carol Diaz. Mary Severson was the sister of Maria Gray. Mary Severson's life had purpose, and it had meaning. Your duty today is to give her death justice." The prosecutor also referred to Mary just having spent her last Christmas with her family.

147 Idaho at 720, 215 P.3d 440. The Court noted that while the references to the family were "arguably improper," the comments "did not constitute fundamental error." *Id.* The Court reasoned that "[t]he statements were not dwelled [sic] upon or made in support of an argument that Severson receive a harsher punishment." *Id.* "Instead, the statements merely reiterated evidence that had been produced at trial." *Id.* "Moreover, the trial court instructed the jury on several occasions that the prosecutor's arguments were not to be regarded as evidence." *Id.*

Just like the comments in *Severson*, the prosecutor's comments here discussed evidence admitted at trial. Additionally, Hall makes no argument that the prosecutor dwelt on Henneman's family during opening statements, and a review of the entirety of the prosecutor's opening statement confirms that the prosecutor did not. Furthermore, like the trial court in *Severson*, the trial court here instructed the jury to consider only the evidence and admonished the jury that statements by counsel were not evidence. Therefore, even if the comments were improper, the comments do not constitute fundamental error.

Because Hall has not shown the prosecutor's opening statement rose to the level of misconduct, he has failed to demonstrate how the SAPD would have proven fundamental error on direct appeal. Therefore, he has failed to show that there is a reasonable probability that, but for the SAPD's failure to appeal this claim, the result of his direct appeal would have been different.

### 2. *References to the jury during closing arguments*

The prosecution stated the following near the beginning of its closing argument to the jury:

> We've been on a long journey together. You began one month ago now, on September 20th when you began filling out jury questionnaires and began getting involved in this process. And it's a far cry from getting that letter in the mail that says "jury summons" to sitting in this box deciding a capital case. And you all have been through a great deal during the course of the last 30 days to get where you are.

23

Think about a journey that lasted 915 days, from September 24th, 2000, to March 27th, 2003. That was the journey that Cory Stambaugh and Dave Smith rode, 915 days from the time than Lynn Henneman was missing until they had this (indicating) man.

You have a considerable advantage here. You've had this case presented to you in what I hope has been a sensible manner. Mr. Bourne and I have endeavored to present it to you in a manner that made it easy to understand. And we've endeavored to present to you all of the evidence that we thought you needed to hear this case.

We're nearing the point now where your roles are going to change significantly. Instead of listening to, [sic] the way you're doing now, in a couple of hours you're going to be back in your room and you're going to be talking. And it's a big shift from spending several weeks waiting while we're doing voir dire, and several days in the courtroom as we're bringing testimony before you, you haven't been able to ask questions. You haven't been able to get into it. You haven't been able to intervene. You've had to sit there and listen. But in a few minutes you're going to go back there and you're going to have a chance to do something in this case.

*Another advantage you have is all the experience on the panel. You've got jurors in this panel who have sat on four prior cases. You know how this works. You've got a number of jurors who have sat on some cases. Stick together with them. Trust each other.* Follow the Judge's instructions and you'll do well.

You get to take back with you all of these exhibits (indicating), the tapes, photographs; by my count more than 140 exhibits. You're going to get the opportunity to hear what both sides think about this case. And for those of you who haven't been jurors before, I talk first, and then the Defense talks and then Mr. Bourne will wrap this up because the burden of proof is on us.

You'll have both side's arguments, you'll have all the exhibits, you'll have your notes and your observations. But don't forget to take back in there with you into the jury room the most important thing that you brought here with you. Don't forget to take with you into the jury room that which makes our system the envy of the world. Don't forget to take with you your common sense. Because you are what makes this system work. Lawyers and judges know a lot of things. Jurors know a lot about common sense. Don't forget it.

(Italics added.) Hall specifically takes issue with the italicized language in the excerpt above.

The district court dismissed Hall's claim, reasoning that, rather than the prosecutor having improper motives, an "equally plausible" explanation was that the prosecutor was remarking that jury sequestration during a capital trial can be difficult. The district court opined that "[u]rging the jurors to 'stick with' the jurors who had been through the process before very well could have been intended solely to convey assurance to jurors who had never been through it that they will get

through the process together." The district court further concluded that, even if the comments were improper, any error was harmless because, "[a]t most, the comment was ambiguous in meaning[.]"

On appeal, Hall asserts that, when referring to the jurors with trial experience, the prosecution intended to convince the less-experienced jurors to go along with the jurors who were in favor of the death penalty and the prosecution. Hall argues that this prejudiced him in both the guilt phase and the sentencing phase of his capital trial because "jurors that tend to support death sentences are also jurors that tend to convict" and "a unanimous vote on the sentence was not required[.]" Hall contends that the district court ignored the evidence that the more-experienced jurors were pro-death penalty and "wholly overlooked" the prosecution's singling out of certain jurors in summation.

The State first attacks Hall's contention that the prosecution addressed individual jurors. "Rather," the State argues, "the prosecutor merely noted some jurors had prior experience sitting on a jury and that the jury should '[s]tick together with them. Trust each other.'" (Alteration in original.) The State contends that, in context with the rest of the prosecutor's remarks, the comments Hall takes issue with "were designed to alleviate the jurors' concerns regarding the remainder of the trial" and were not inappropriate.

We conclude that the district court correctly dismissed Hall's claim. The United States Supreme Court has noted that closing arguments "are seldom carefully constructed in toto before the event; improvisation frequently results in syntax left imperfect and meaning less than crystal clear." *Donnelly*, 416 U.S. at 646–47. Thus, "a court should not lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning or that a jury, sitting through lengthy exhortation, will draw that meaning from the plethora of less damaging interpretations." *Id.* at 647.

Reading the prosecutor's challenged remarks in context, it appears that the prosecutor was addressing the jury regarding the difficult task ahead of them. Notably, the challenged remarks come just after the prosecutor discussed the "long journey" from jury summons to the deliberation room. Additionally, the prosecutor next discussed the hope that the prosecution has presented the case in "a sensible manner" and made the evidence "easy to understand." Capital trials are notoriously lengthy, and this case involved particularly gruesome facts. It is reasonable to interpret the prosecutor's comments as simply acknowledging that this was a difficult case for the jurors.

This interpretation is further supported by the prosecutor's comments just after the challenged remarks: the prosecutor goes on to explain that the jury will have access to all the exhibits in the jury room. He then further explains the process of closing arguments in general. Hall takes the challenged remarks out of context to support his interpretation. We agree with the district court that the more reasonable explanation was that the prosecutor was simply telling the jurors to "stick with" each other during the difficult deliberation process.

Because Hall has not shown the prosecutor's closing remarks rose to the level of misconduct, he has failed to demonstrate how the SAPD would have proven fundamental error on direct appeal. Therefore, he has failed to show that there is a reasonable probability that, but for the SAPD's failure to appeal this claim, the result of his direct appeal would have been different.

In sum, because Hall has not established he was prejudiced by the SAPD's performance, we hold that the district court did not err in dismissing Hall's prosecutorial misconduct claim.

> iv. *The district court did not err in dismissing Hall's cumulative error claim.*

Hall also contends that appellate counsel should have raised a cumulative error argument that included the errors he asserts should have been raised on appeal. The district court correctly dismissed the claim. "Under the doctrine of cumulative error, a series of errors, harmless in and of themselves, may in the aggregate show the absence of a fair trial." *Perry*, 150 Idaho at 230, 245 P.3d at 982. "However, a necessary predicate to the application of the doctrine is finding more than one error." *Id.* "[A]lleged errors at trial, that are not followed by a contemporaneous objection, will not be considered under the cumulative error doctrine unless said errors are found to pass the threshold analysis under our fundamental error doctrine." *Id.* As discussed above, Hall has failed to establish that, had the SAPD raised these claims on appeal, this Court would have agreed any of his claims amounted to error. Because Hall has not established any errors, the district court did not err in dismissing his cumulative error claim.

> 2. The penalty phase issues

Hall next challenges the district court's dismissal of his claims regarding the penalty-phase of his capital trial. For the reasons discussed below, we conclude that the district court did not err in dismissing Hall's sentencing claims.

> i. *The district court did not err in dismissing Hall's Idaho-specific evolving standards of decency claim.*

26

In his successive amended petition, Hall alleged his appellate counsel were deficient for failing to argue that the imposition of the death penalty went against the evolving standards of decency in Idaho. The district court summarily dismissed the claim for two reasons. First, the district court concluded that Hall's claim was barred by *res judicata* because the SAPD raised a national evolving standards of decency claim under the Eighth Amendment on direct appeal. The district court reasoned that Hall was essentially attempting to "recycle" that claim here: "All Hall is attempting to do here is reframe a more specific issue within a claim already made and rejected."

Second, the district court dismissed Hall's claim on the merits. The district court noted that Hall had relied on case law rather than legislative or executive actions to prove that the death penalty was contrary to the evolving standards of decency in Idaho, a premise that this Court rejected in *Abdullah*, 158 Idaho at 455, 348 P.3d at 70.

On appeal, Hall argues that his claim is not barred by *res judicata*. He stresses that a state-specific claim is different than a national claim. As to the merits of his claim, he contends that the SAPD should have raised two specific sub-issues: "First, because Idaho has drifted so far away from the death penalty, and because its cruel-and-unusual-punishment clause tracks the Eighth Amendment, it violates the state constitution. And second, it violates the Eighth Amendment to be sentenced to death in a jurisdiction where the death penalty has become so unpopular."

The State maintains that Hall is now attempting to bring the same claim he brought before this Court in *Hall II*, "merely enhanced by additional evidence[.]" The State argues that Hall cannot establish deficient performance because his claim is novel. The State asserts that the district court correctly concluded Hall had failed to present any evidence of "legislative enactments or executive action to prove Idaho's consensus against the death penalty." Finally, the State contends that the United States Supreme Court has "definitively concluded" that capital punishment is constitutional under the Eighth Amendment, and this Court is without the authority to overrule Supreme Court precedent.

We first address the parties' *res judicata* arguments.

The doctrine of res judicata covers both claim preclusion (true *res judicata*) and issue preclusion (collateral estoppel). *Hindmarsh v. Mock*, 138 Idaho 92, 94, 57 P.3d 803, 805 (2002). Claim preclusion bars a subsequent action between the same parties upon the same claim or upon claims "relating to the same cause of action . . . which might have been made." *Id.* Issue preclusion protects litigants from litigating an identical issue with the same party or its privy. *Rodriguez v. Dep't of Corr.*, 136 Idaho 90, 92, 29 P.3d 401, 403 (2001). . . . *Res judicata* serves three fundamental

27

purposes: (1) it preserves the acceptability of judicial dispute resolution against the corrosive disrespect that would follow if the same matter were twice litigated to inconsistent results; (2) it serves the public interest in protecting the courts against the burdens of repetitious litigation; and (3) it advances the private interest in repose from the harassment of repetitive claims. *Hindmarsh*, 138 Idaho at 94, 57 P.3d at 805 (quoting *Aldape v. Akins*, 105 Idaho 254, 257, 668 P.2d 130, 133 (Ct. App. 1983)).

*Ticor Title Co. v. Stanion*, 144 Idaho 119, 123, 157 P.3d 613, 617 (2007).

We conclude the district court incorrectly determined that Hall's claim is barred by *res judicata* for two reasons. First, Hall's current claim is not the same as his prior claim. On direct appeal, the SAPD specifically argued that it was unconstitutional to execute mentally ill defendants. *Hall II*, 163 Idaho at 814, 419 P.3d at 1112. The following excerpt is the entirety of this Court's discussion of Hall's prior evolving standards of decency claim:

> Hall argues that *Atkins v. Virginia*, 536 U.S. 304, 122 S.Ct. 2242 (2002), should be extended to mentally ill defendants. In *Atkins*, the United States Supreme Court declared that imposing the death penalty on [intellectually disabled] individuals violated the Eighth Amendment. *Id.* at 320, 122 S.Ct. 2242.

> This Court has recently upheld the constitutionality of Idaho's death penalty scheme in *State v. Dunlap*, 155 Idaho 345, 380, 313 P.3d 1, 36 (2013) and in *Abdullah*, 158 Idaho at 386, 348 P.3d at 70. The argument advanced in *Dunlap* is identical to Hall's: "Dunlap contends that the rationale underlying *Atkins* and *Ford* [prohibiting the capital punishment of intellectually disabled defendants] compels the same conclusion for mentally ill defendants." *Dunlap*, 155 Idaho at 380, 313 P.3d at 36. In addressing this contention, this Court observed:

>> It appears that every court that has considered this issue [has] refused to extend *Atkins* and hold that the Eighth Amendment categorically prohibits the execution of the mentally ill. . . . We join these courts in holding that a defendant's mental illness does not prevent imposition of a capital sentence.

> *Id.* Hall urges this Court to revisit prior decisions in light of recent "botched executions" and argues that societal standards of decency have evolved such that the death penalty is no longer widely accepted for mentally ill defendants.

> This contention is without merit. Hall claims there have been recent "botched executions," but does not support this claim with specifics or citation to any source or authority. Unsupported claims are an insufficient basis for revisiting controlling precedent. *State v. Owens*, 158 Idaho 1, 4–5, 343 P.3d 30, 33–34 (2015) ("Stare decisis requires that this Court follow[] controlling precedent unless that precedent is manifestly wrong, has proven over time to be unjust or unwise, or overruling that precedent is necessary to vindicate plain, obvious principles of law and remedy continued injustice."). Hall has failed to show that *Dunlap* and *Abdullah* are manifestly wrong or that they have proven unjust or unwise.

28

With regard to his claims about evolving societal standards, in addition to the extensive case law cited in *Dunlap*, review of cases decided since *Dunlap* reveals that the consensus against the extension of *Atkins* to mentally ill defendants has not changed. *See e.g., Johnson v. Stephens*, 617 Fed. Appx. 293, 303 (5th Cir. 2015); *Dickerson v. State*, 175 So.3d 8, 18 (Miss. 2015); *State ex. rel. Clayton v. Griffith*, 457 S.W.3d 735, 752–54 (Mo. 2015); *People v. Hajek*, 58 Cal.4th 1144, 171 Cal.Rptr.3d 234, 324 P.3d 88, 174 (2014), *overruled on other grounds by People v. Rangel*, 62 Cal.4th 1192, 200 Cal.Rptr.3d 265, 367 P.3d 649 (2016); *Com v. Robinson*, 623 Pa. 345, 82 A.3d 998, 1021 (2013). For these reasons, we again decline to extend *Atkins* to mentally ill defendants.

*Id.* (some alterations in original).

Here, Hall's claim focuses on evolving standards of decency and the imposition of the death penalty in general. The current claim, as opposed to his prior claim, does not involve *Atkins* or in any way involve mentally ill defendants. Additionally, Hall brings this claim under both the Eighth Amendment and the Idaho Constitution, where his claim in *Hall II* focused solely on the Eighth Amendment. In addition, Hall's current claim is that his appellate counsel were ineffective in failing to raise a general evolving standards of decency claim under both the state and federal constitutions; in contrast, his prior claim did not involve any assertion as to the ineffectiveness of counsel. Therefore, the current claim is not the same as the prior claim for purposes of *res judicata*.

Second, and more importantly, the doctrine of *res judicata* has no place in the analysis of an ineffective assistance of counsel claim in the specific instance where counsel made an unreasonable choice of argument. As noted above, this Court evaluates ineffective assistance of appellate counsel claims under the test set forth in *Strickland*, 466 U.S. 668. *Dunlap VI*, 159 Idaho at 296, 360 P.3d at 305. "To prove counsel's performance was deficient, 'the defendant must show that counsel's representation fell below an objective standard of reasonableness.'" *Id.* (quoting *Strickland*, 466 U.S. at 688). If appellate counsel unreasonably argued a claim and lost the appeal, it could be possible that, had counsel presented a clearly stronger argument, the result of the appeal would have been different, rendering counsel's deficient performance prejudicial. That this Court already denied the claim on the merits presented by counsel (which were purportedly unreasonable) serves to form a basis for the result of that proceeding, but it may not be used to circumvent a cognizable ineffective assistance of counsel claim based upon unreasonable arguments.

The cases the State cites in support of its position are unpersuasive. In *State v. Creech*, this Court explained in a footnote that "when legal issues are decided in a criminal action on direct

29

appeal, the defendant is barred by the doctrine of *res judicata* from raising them again in a post-conviction relief proceeding." 132 Idaho 1, 9 n.1, 966 P.2d 1, 9 n.1 (1998). Though the Court noted that *res judicata* barred some of the defendant's claims because the claims were adjudicated in his federal habeas corpus proceeding, *id.*, this Court went on to consider all of the ineffective assistance of counsel claims on their merits, *id.* at 17–21, 966 P.2d at 17–21. Notably, this Court determined that "[t]he issue whether Creech should be allowed to withdraw his guilty plea is barred by the doctrine of *res judicata*" but did not apply *res judicata* to "[t]he issue whether trial counsel's performance was deficient in preparing Creech's motion to withdraw his guilty plea[.]" *Id.* at 21, 966 P.2d at 21.

Additionally, in *Schultz v. State*, the Idaho Court of Appeals applied *res judicata* against a defendant who argued his trial counsel was ineffective for failing to enforce his plea agreement. 153 Idaho 791, 797, 291 P.3d 474, 480 (Ct. App. 2012). Noting that "all of Schultz's petition [for post-conviction relief] allegations presuppose that there was an enforceable 'plea agreement[,]'" the Court of Appeals reasoned that, because it had determined the plea agreement was unenforceable in a prior appeal, that the claim of ineffective assistance of counsel was barred by *res judicata*. *Id.* at 797–98, 291 P.3d at 480–81. The defendant in *Schultz*, however, did not argue that his prior appellate counsel were ineffective in how they argued for the enforceability of the plea agreement. *See id.*

We hold that, in the specific instance where a defendant contends his prior counsel made an unreasonable choice of argument, the doctrine of *res judicata* is inapplicable to bar his claim. As such, the district court erred when it applied *res judicata* to Hall's evolving standards of decency claim.

However, while the district court's reliance on *res judicata* was improper, we conclude that the district court did not err in dismissing Hall's claim on its merits. As the State argues, Hall's claim is novel. "[T]his Court will generally not find deficient performance where counsel fails to argue a novel theory in an undeveloped area of law." *Schoger v. State*, 148 Idaho 622, 630, 226 P.3d 1269, 1277 (2010). Hall first points to *Jones v. Chappell*, 31 F. Supp. 3d 1050 (C. D. Cal. 2014) to illustrate that his claim "should have been on appellate counsel's radar." *Jones*, however, involved an entirely different claim: that California's death penalty system was unconstitutional under the Eighth Amendment because the delay in time from receiving a death sentence to being put to death rendered the system arbitrary. *Id.* at 1060–61. Additionally, as a decision from a United

30

States District Court in California, *Jones* is not binding on this Court. *See id.* More to the point, *Jones* was overturned on appeal by the Ninth Circuit, *Jones v. Davis*, 806 F.3d 538, 541 (2015), and is therefore not even persuasive authority.

Hall also points to *State v. Bartol*, in which the Oregon Supreme Court reversed a defendant's death sentence on state constitutional grounds. 496 P.3d 1013, 1029 (Ore. 2021). While the defendant in *Bartol* did make an evolving standards of decency argument, the decision rested on the Oregon Supreme Court's interpretation of new legislation that, had it been in place at the time Bartol committed the murder, would have rendered him ineligible to receive the death penalty. *Id.* The court reasoned: "Maintaining his death sentence would allow the execution of a person for conduct that the legislature has determined no longer justifies that unique and ultimate punishment[.]" *Id.* "[I]t would allow the execution of a person for conduct that the legislature has determined is no more culpable than conduct that should not result in death." *Id.* Hall has not pointed to any legislative action which suggests the same result should occur here. Moreover, the *Bartol* opinion was released on October 7, 2021, more than three years after this Court's opinion in *Hall II*. Thus, even if *Bartol* is relevant, there is no way it could have alerted the SAPD to the merits of Hall's current claim.

Most importantly, Hall has failed to cite a single Idaho case to show that his claim is not novel. This, at the very least, suggests that this is "an undeveloped area of the law." *See Schoger*, 148 Idaho at 630, 226 P.3d at 1277 (noting that "the law [was] not fully articulated or established *in Idaho*" (italics added)). Therefore, Hall has failed to establish appellate counsel were deficient in failing to raise a novel claim.

We do note that, while the State is correct that this Court is without the authority to overrule precedent set forth by the United States Supreme Court as to the Eighth Amendment, Hall has raised a state constitutional claim as well. As Hall points out in his reply brief, it is well-established "that in interpreting provisions of our constitution that are similar to those of the federal constitution[, this Court is] free to extend protections under our constitution beyond those granted by the United States Supreme Court under the federal constitution." *State v. Thompson*, 114 Idaho 746, 748, 760 P.2d 1162, 1164 (1988). However, Hall has not provided any argument or authority as to why this Court should interpret the prohibition against cruel and unusual punishments contained in Article I, section 6 of the Idaho Constitution any broader than the similar prohibition in the federal constitution. *See e.g., State v. Donato*, 135 Idaho 469, 472, 20 P.3d 5, 8 (2001)

31

(explaining that this Court may declare the Idaho Constitution to provide greater protection than the federal constitution in some instances).

Therefore, Hall has failed to establish that his appellate counsel were deficient for failing to raise his current evolving standards of decency claim. Thus, the district court did not err in dismissing Hall's claim.

ii. *The district court did not err in dismissing Hall's prosecutorial misconduct claim.*

In his successive amended petition, Hall alleged his appellate counsel were ineffective for failing to argue that the PowerPoint presentation the prosecutor used in closing argument amounted to prosecutorial misconduct. While the SAPD argued that specific slides within the PowerPoint were misconduct on the part of the prosecutor, Hall contended that appellate counsel should have challenged the PowerPoint as a whole. The district court dismissed Hall's claim for two reasons. First, the district court concluded that Hall's claim was barred by *res judicata* because the SAPD had challenged the PowerPoint on direct appeal. Second, the district court determined that, had Hall's appellate counsel made the arguments on appeal Hall argued they should have, he could not have satisfied the fundamental error test.

On appeal, Hall argues the district court erred in dismissing his claim pursuant to *res judicata* because his current claim is different from the one raised by the SAPD on direct appeal. He points out that the SAPD only raised arguments as to a few, specific slides, where he now argues the PowerPoint taken as a whole rendered his trial fundamentally unfair. Hall also contends the district court erred in dismissing his claim on the merits. Specifically, Hall contends that this Court on direct appeal found error with respect to the admission of his mugshot photo and a slide animation showing the aggravation and mitigation scales. Hall argues that, although this Court found these errors harmless, this Court would have found them harmful when considered in context of the entire PowerPoint, which was replete with additional prejudicial graphics and animations.

In response, the State maintains that Hall's current claim is the same claim brought by the SAPD on direct appeal and, as such, is barred by *res judicata*. The State further argues that Hall has failed to establish fundamental error. The State asserts that, while this Court previously found the admission of Hall's mugshot photo to be erroneous, that decision was based on relevance, not due process. Additionally, the State acknowledges this Court found the "weighing slide" improper but argues that Hall has failed to show any of the remaining slides were improper or were not harmless. Furthermore, the State contends, the trial court instructed the jury "repeatedly [] that

32

arguments and statements of counsel are not evidence and should not be considered when deciding whether to impose the death penalty."

We hold that the district court correctly dismissed Hall's claim on *res judicata* grounds. As discussed above, *res judicata* does not bar claims that counsel were ineffective for unreasonably failing to raise arguments. However, where the previously raised claims are as substantially related to claims the petitioner asserts should have been raised, as they are here, such claims are barred. Hall's argument here is that the PowerPoint was improper as a whole and that the SAPD supplied ineffective assistance of counsel by only challenging specific PowerPoint slides. Yet, he concedes that the SAPD challenged the "most egregious" slide: "the animation of a scale weighing all aggravation against the impact of [his] childhood as mitigation[.]" Although couched in more expansive terms, the current claim is essentially the other side of the same coin as the claim the SAPD brought on direct appeal. We decline to allow Hall another bite at the same apple. Accordingly, we hold that the district court did not err in dismissing Hall's prosecutorial misconduct claim.

> iii.   *The district court did not err in dismissing Hall's "right to present mitigation" claim.*

During the sentencing phase of Hall's capital trial, Hall presented evidence of his "traumatic childhood and abusive family" through the testimony of several family members. *Hall II*, 163 Idaho at 823, 419 P.3d at 1121. In his successive amended petition for post-conviction relief, Hall asserted that his appellate counsel were ineffective for failing to argue that his right to present mitigation was unconstitutionally violated because the trial court sustained the prosecutor's objections when his cousin, sister, and half-sister attempted to testify to the sexual abuse they each experienced when they and Hall were growing up. The district court dismissed Hall's claim for two reasons. First, the district court concluded that Hall had failed to present a prima facie claim, reasoning that he had failed to provide "evidence of what additional mitigation testimony Hall's counsel intended to elicit from the family members but for the trial court's decision to limit the sexual abuse testimony to abuse Hall saw or by which he was otherwise impacted." Second, the district court concluded that Hall had failed to show fundamental error. The district court reasoned that, even if the trial court erred in refusing to allow the testimony, it was "very unlikely that additional testimony" by the family members "regarding details of their childhood sexual experiences in the family home would have changed the outcome" because the testimony those

witnesses were able to give had already "painted a picture of extreme sexual dysfunction and abuse in Hall's childhood home."

Both Hall and the State agree on appeal that, because this claim concerns appellate counsel directly appealing the ruling rather than making a post-conviction ineffective assistance of trial counsel claim, the district court was incorrect in faulting Hall for failing to "provide[] evidence of what additional mitigation testimony [his trial] counsel intended to elicit from the family members[.]" However, the parties disagree as to whether the district court directly dismissed the claim on its merits. Hall argues that, because trial counsel preserved the issue, the claim should have been reviewed under a harmless error standard rather than a fundamental error standard. Hall contends that, under *Lockett v. Ohio*, 438 U.S. 586, 602–05 (1978), he should have been allowed to present a broad range of relevant mitigation evidence. Hall argues that there is a low threshold for admissibility in the sentencing phase of a capital trial, and that "[a] family history of sexual abuse is relevant and essential evidence that has a tendency to appeal to a jury's sympathy for an individual defendant."

The State counters that the district court properly determined that the appropriate standard is the fundamental error test. While the State concedes Hall's point that "the mere fact of knowing about extensive sexual abuse in one's family is traumatic in its own right," the State maintains that the evidence at issue here was irrelevant to the sentencing proceedings because the trial court only excluded testimony as to events Hall did not observe or know about.

Hall's claim fails on the merits regardless of which standard we use to analyze his claim. As noted by the district court, this Court previously discussed the mitigation evidence presented through Hall's family members at sentencing:

> Trial counsel presented compelling mitigation evidence related to Hall's life and family history. Hall's sister, two half-sisters and cousin (who lived with Hall's family for a time) all testified about the horrendous living conditions in their family and Hall's traumatic childhood. They testified in emotional detail that as children, they were frequently hungry and lacked adequate clothing, basic hygiene, supervision, and care. *They were also subjected to constant physical, emotional and sexual abuse—at the hands of their parents, other adults, siblings and even neighbors.*

*Hall II*, 163 Idaho at 823, 419 P.3d at 1121 (italics added). This is borne out by the record. Hall's cousin testified at sentencing that, as children, she and some of Hall's siblings sexually "experimented with each other." She testified that the children were "touching," "had their clothes off," and that "there [would] have been sexual intercourse" between the children, all in Hall's

34

presence. She further testified that there were issues in the household because Hall's mother's boyfriend had "molested and raped" Hall's younger sister, which led to Hall's sister being placed in foster care.

In turn, Hall's younger sister testified to the sexual abuse she experienced growing up in the same household as Hall, first at the hands of their older brother, then at the hands of their mother's boyfriend. She explained that the older brother "was actually having intercourse with [her.]" At that point, the trial court sustained the prosecutor's objection to this testimony because "[i]t has to be something that has an impact, I guess on – or observed by Mr. Hall." However, Hall's trial counsel immediately asked whether Hall "would have been in the household during all this," and Hall's sister was able to explain how small the house was that they shared. Additionally, though the trial court sustained a similar objection when Hall's trial counsel asked the sister "how" the mother's boyfriend had touched her, the sister was still able to testify to some of the inappropriate behavior that Hall witnessed while the four of them shared a small, one-bedroom apartment where she and Hall slept in the living room. She testified: "My mother and [her boyfriend] were asleep in the bedroom they [sic] were obviously having sex because we could hear it and when he was done he came in and tried to lay [sic] down with me while he was naked and Erick was on the couch."

Like Hall's cousin, Hall's older half-sister also testified about the inappropriate sexual relationship between some of the children growing up, "touching and kissing and almost having intercourse." She testified that Hall had seen them on one occasion and been asked to participate, but that he became angry and ran away. She further testified that, even when Hall was not present, he was in the room with the children while they had conversations about the sexual relations and "probably overheard." Additionally, Hall's half-sister testified that there was a neighbor who would offer the children "candy or popcorn or whatever" in exchange for inappropriate sexual "things that he wanted." She further testified that Hall would have known about it.

In arguing that the SAPD should have brought this claim, Hall takes the prosecutor's objections out of context and ignores the sexual nature of the testimony that was admitted. As the district court noted, any additional evidence of the sexual history and abuse in Hall's childhood home likely would have been cumulative of the evidence elicited at trial. In his reply brief, Hall states that "a defendant who grows up in a home pervaded by sexual abuse and trauma is one potentially more deserving of mercy in the eyes of at least one juror, especially when he is

35

convicted of a rape-murder." Given the full context of the three family members' testimony, it appears that the jury was given just that: an account of that sexual abuse, dysfunction, and trauma.

We conclude that Hall has failed to show that there is a reasonable probability that, but for the SAPD's failure to appeal the restrictions on the family members' testimony, the result of his direct appeal would have been different. Because he has not established he was prejudiced by the SAPD's performance, we hold that the district court did not err in dismissing the "right to present mitigation" claim.

> *iv.*     *The district court did not err in dismissing Hall's cumulative error claim.*

Hall also contends that appellate counsel should have raised a cumulative error argument that included the sentencing errors he asserts they should have raised on appeal. The district court dismissed the claim.

The district court was correct in dismissing the claim. As discussed above, "[u]nder the doctrine of cumulative error, a series of errors, harmless in and of themselves, may in the aggregate show the absence of a fair trial." *Perry*, 150 Idaho at 230, 245 P.3d at 982. "However, a necessary predicate to the application of the doctrine is finding more than one error." *Id.* "[A]lleged errors at trial, that are not followed by a contemporaneous objection, will not be considered under the cumulative error doctrine unless said errors are found to pass the threshold analysis under our fundamental error doctrine." *Id.* Because Hall has failed to establish this Court would have agreed any of his sentencing claims amounted to error, the district court did not err in dismissing his cumulative error claim.

### 3.   The post-conviction issues

Hall also challenges the district court's dismissal of his ineffective assistance of appellate counsel claims regarding his first petition for post-conviction relief. As a preliminary matter, we note that the parties dispute whether Hall has a right to effective assistance of counsel in post-conviction proceedings. We need not and do not decide this point of law today because, as discussed below, we conclude the district court did not err in dismissing Hall's post-conviction claims on the merits.

> *i.*     *The district court did not err in dismissing Hall's judicial bias claim.*

Judge Neville, who presided over Hall's capital trial, also presided over Hall's original

post-conviction proceeding.[5] Hall's post-conviction counsel—also the SAPD—moved to disqualify Judge Neville on the basis of actual bias and the appearance of bias. Judge Neville denied the motion. The SAPD requested permission to appeal Judge Neville's decision from both the trial court and this Court; both requests were denied. Once the case had concluded in trial court, the SAPD did not appeal the denial of the motion when it appealed to this Court.

On this new appeal, Hall asserts that the district court erred in dismissing his claim because the SAPD were ineffective for failing to appeal the trial court's denial of the motion to disqualify Judge Neville. Hall contends that the SAPD raised "weighty" issues in its motion to disqualify below, and those issues "should have been raised on [the initial] appeal." Hall notes that the SAPD put forth three arguments before the trial court but further argues that the SAPD should have raised "a host of other points" in support of that claim on appeal, including an argument that the trial court failed to consider the appearance of bias in denying the motion.

In response, the State argues that Hall has failed to show that the SAPD could have established that the trial court abused its discretion on appeal. The State asserts that Hall fails to cite the standard for an abuse of discretion. The State further contends that Hall has not pointed to any facts that give rise to judicial bias, whether actual bias or the appearance of bias.

"[O]pinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep seated favoritism or antagonism that would make fair judgment impossible." *Dunlap V*, 155 Idaho at 391, 313 P.3d at 47 (quoting *Liteky v. United States*, 510 U.S. 540, 555–56 (1994)). "Thus, judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge[.]" *Id.*

"Whether it is necessary for a judicial officer to disqualify himself in a given case is left to the sound discretion of the judicial officer himself." *Zylstra v. State*, 157 Idaho 457, 460, 337 P.3d 616, 619 (2014) (quoting *Bradbury v. Idaho Judicial Council*, 149 Idaho 107, 113, 233 P.3d 38, 44 (2009)). "When reviewing a trial court's decision for abuse of discretion, this Court assesses '[w]hether the trial court: (1) correctly perceived the issue as one of discretion; (2) acted within the outer boundaries of its discretion; (3) acted consistently with the legal standards applicable to

---

[5] This opinion will continue to refer to Judge Neville's court as the "trial court" to differentiate it from Judge Hippler's "district court."

the specific choices available to it; and (4) reached its decision by the exercise of reason.'" *Pizzuto*, 168 Idaho at 547, 484 P.3d at 828 (quoting *Lunneborg*, 163 Idaho at 863, 421 P.3d at 194) (bracketed alteration in original).

Because Hall has failed to argue that the trial court abused its discretion, we hold that the district court correctly dismissed his claim. At no point in his opening brief does Hall cite the standard for abuse of discretion, argue under any of the four factors in the *Lunneborg* test, or even argue that the SAPD could have shown the trial court abused its discretion on direct appeal. The word "discretion" does not appear anywhere in Hall's opening brief with respect to this issue. "The party asserting the abuse of discretion carries the burden of demonstrating that an abuse of discretion occurred, and a failure to do so is fatal to its argument." *Matter of Doe I*, 165 Idaho 33, 44, 437 P.3d 33, 44 (2019) (quoting *Nielson v. Talbot*, 163 Idaho 480, 489, 415 P.3d 348, 357 (2018)). "Failing to demonstrate that an abuse of discretion occurred under any part of the test applied by this Court . . . is fatal to [an] argument that the court abused its discretion." *Id.* (quoting *Valiant Idaho, LLC v. VP Inc.*, 164 Idaho 314, 332, 429 P.3d 855, 873 (2018)) (alterations in original).

In his reply brief, Hall argues that he has shown an abuse of discretion because "[t]he opening brief explains how Judge Neville effectively applied a subjective test to the recusal motion, and did not properly consider whether there was an objective appearance of bias, which is the correct standard." However, once again he fails to cite to or argue this Court's four-part abuse of discretion test. Additionally, in the trial court's oral ruling and written order, the trial court explicitly concluded that there was no appearance of bias. Therefore, the record shows that—contrary to Hall's contention—the trial court analyzed the motion pursuant to Hall's suggested standard.

Because Hall has not "even attempt[ed] to demonstrate[] that an abuse of discretion occurred under any part of the four-part standard applied by this Court[,]" we conclude the district court correctly dismissed this claim. *See Matter of Doe I*, 165 Idaho at 44, 437 P.3d at 44. Therefore, we hold that the district court did not err when it determined Hall's appellate counsel were not deficient when they failed to raise this claim on appeal and, as such, the district court did not err when it dismissed this claim.

### ii. The district court did not err in dismissing Hall's discovery claim.

Before the trial court below, the SAPD made an extensive discovery request. Relevant here, the SAPD requested discovery pertaining to: (1) the prosecution's forensic pathologist, Dr. Groben, who performed the autopsy on Henneman; (2) the DNA evidence recovered from Henneman's body; (3) the psychological profile prepared by the FBI in investigating Henneman's death; (4) communications between the prosecution and the media; and (5) trial counsel's case load at the time of Hall's trial. The trial court denied the discovery requests, and the SAPD did not appeal those denials.

In his successive amended petition, Hall alleged the SAPD was ineffective for failing to appeal the discovery denials. The district court dismissed the claim, concluding that "appellate counsel did not make an unreasonable decision to omit the claim because the claim would have been futile." The district court further concluded that any error in declining to order discovery was harmless.

On appeal, Hall argues that the trial court abused its discretion when it denied discovery and, as such, Hall's post-conviction appellate counsel were ineffective for not raising the issue on appeal. Hall contends that the trial court did not reach its decision by an exercise of reason and misunderstood "the nature of the claims in the post-conviction petition."

The State responds that the district court correctly determined that, had Hall's appellate counsel raised this issue on appeal, it would have been futile. The State contends Hall's appellate counsels' tactical decisions are entitled to deference and points out that Hall's appellate counsel raised other instances of discovery denials on appeal. Furthermore, the State asserts, "Hall has failed to explain how the denial of any of the discovery he now claims should have been raised on appeal affects his substantial rights."

Whether to grant a post-conviction petitioner's discovery request is a discretionary decision:

> "The decision to authorize discovery during post-conviction relief is a matter left to the sound discretion of the district court." *Raudebaugh v. State*, 135 Idaho 602, 605, 21 P.3d 924, 927 (2001). "Unless discovery is necessary to protect an applicant's substantial rights, the district court is not required to order discovery." *Baldwin v. State*, 145 Idaho 148, 157, 177 P.3d 362, 371 (2008). "This Court has previously applied standard post-conviction discovery standards in capital proceedings." *Hall v. State*, 151 Idaho 42, 53, 253 P.3d 716, 727 (2011) [(*Hall I*)]; *see also Fields v. State*, 135 Idaho 286, 291, 17 P.3d 230, 235 (2000).

*Hall II*, 163 Idaho at 833, 419 P.3d at 1131.

39

> The petitioner "must identify the specific subject matter where discovery is requested and why discovery as to those matters is necessary to his or her application." [*Hall I*, 151 Idaho at 45, 253 P.3d at 719] (quoting *State v. LePage*, 138 Idaho 803, 810, 69 P.3d 1064, 1071 (Ct. App. 2003)). While reasonable discovery may be permitted, the district court should not allow the petitioner to engage in a "[f]ishing expedition." *Murphy v. State*, 143 Idaho 139, 148, 139 P.3d 741, 750 (Ct. App. 2006). "The UPCPA provides a forum for known grievances, not an opportunity to research for grievances." *Id.*

*Abdullah*, 158 Idaho at 482, 348 P.3d at 97. "[A] post-conviction action is not a vehicle for unrestrained testing or retesting of physical evidence introduced at the criminal trial." *Murphy*, 143 Idaho at 148, 139 P.3d at 750.

We conclude the district court correctly rejected Hall's discovery requests. Hall's arguments rest on conjecture about potential evidence, not facts. For example, regarding the other cases Groben testified in, Hall contends that, because his pathologist found issues with Groben's medical conclusions, "there was *great potential upside* to exploring Dr. Groben's conduct in other cases to see if it suffered from similar problems, if it contradicted his opinion in the Hall case, and if it had ever gotten him in trouble before." (Italics added.) This is akin to "research[ing] for grievances." *Murphy*, 143 Idaho at 148, 139 P.3d at 750.

Additionally, Hall fails to connect his denied requests for discovery to how the information would have been relevant to his claims. For example, Hall states that the "denial of discovery on communication between the prosecution and the media suffers from so many serious defects that it is in a category unto itself." Hall then explains that the SAPD was attempting to argue trial counsel was ineffective for failing to move for a change of venue due to the media coverage of the case in Boise. However, at no point does Hall explain *how* communication between the prosecution and the media would have been relevant to this claim; rather, Hall focuses on articles that were published in the Idaho Statesman and the juror questionnaires. If Hall is airing a "known grievance" with respect to the communications, he has not explained that grievance to this Court.

Further, as the State points out, the SAPD appealed other instances in which discovery was denied. On interlocutory appeal, the SAPD pursued discovery with respect to the jurors of the capital trial and Hall's trial counsel's investigator. *Hall I*, 151 Idaho at 42, 253 P.3d at 716. Then, on final appeal, the SAPD appealed the trial court's denial of Hall's discovery requests with respect to three witnesses. *Hall II*, 163 Idaho at 832, 419 P.3d at 1130. The SAPD's decision to appeal certain discovery rulings and not others suggests that the SAPD made a "tactical or strategic

decision to winnow what may have appeared to be weaker issues." *Thumm*, 165 Idaho at 422, 447 P.3d at 870.

Therefore, we conclude that Hall has failed to establish the SAPD was ineffective in failing to challenge the discovery denials, and the district court did not err in dismissing the claim.

*iii.   The district court did not err in dismissing Hall's* Napue *claim.*

The prosecution's sentencing arguments focused primarily on the "propensity to murder" aggravator. To that effect, the prosecutor called N.O., a prior rape victim of Hall, and Daniel Hess, the detective who had investigated the prior rape, to the stand. On cross-examination, the following exchange occurred between Hess and defense counsel:

Q: Were you aware that Miss [N.O.] had had an extensive history of family trouble?

A: Just from my conversation with her, yes.

Q: Did you know what the nature of that trouble was?

A: I have no idea.

Q: Did you ever try to find out?

A: No.

However, the taped[6] interview between Hess and N.O. shows that they did discuss N.O.'s problems at home. The prosecutor did not attempt to correct Hess's testimony.

In his first post-conviction petition, Hall raised a claim under *Napue v. Illinois*, 360 U.S. 264 (1959), alleging that Hess's testimony was false and the prosecution knew it. The trial court found that the testimony was indeed false because Hess spoke with N.O. "at length," and the prosecution knew that the testimony was false. However, the trial court found that the statements were not material and dismissed the claim. The trial court explained:

> Turning to the materiality of the false testimony, the [c]ourt finds that the false testimony was not material as there is no reasonable likelihood that the false testimony could have affected the judgment of the jury. The jury was aware that [N.O.] was a runaway, and the fact that her home life was troubled could be inferred from that fact. It is no less a crime to rape a runaway than it is to rape a teen who lives at home, and there is no reasonable likelihood that the exact nature of [N.O.]'s troubles at home affected the judgment of the jury with regard to its consideration regarding the propensity statutory aggravator.

The SAPD did not appeal the trial court's ruling.

---

[6] The earlier version of this opinion mistakenly referred to the taped interview between N.O. and Hess as "videotaped." The interview was not recorded on video; rather, only the audio was recorded. This opinion has been amended to correct this error.

In his successive post-conviction petition, Hall alleged the SAPD was ineffective for failing to appeal the trial court's dismissal of the *Napue* claim. The district court dismissed the claim, reasoning that the trial court had erred in determining the testimony was false because the testimony was simply ambiguous. Additionally, the district court concluded that the testimony was not material because "Hess was not a critical witness on the issue of propensity nor was his alleged false testimony crucial to any issue in the case."

On appeal, Hall argues that the district court erred in concluding the testimony was not false. He stresses that Hess stated he had "no idea" about the nature of N.O.'s family troubles. Hall further contends that the trial court, which found the testimony to be false, was incorrect when it determined the testimony was not material because the trial court did not address Hess's credibility. Hall asserts that both the trial court and the district court erred in not addressing Hess's credibility.

The State responds that the decision not to appeal the dismissal of the *Napue* claim was tactical on the SAPD's part. The State further asserts that, as to the merits of the claim, Hess's testimony was "merely ambiguous or a misstatement," not false. Moreover, the State contends, any falsity was not material. The State notes that Hess testified to his own investigation of the rape; in contrast, N.O. testified to the factual circumstances of the rape.

"'[A] conviction obtained through use of false evidence, known to be such by representatives of the State,' violates the Fourteenth Amendment, as do convictions obtained in proceedings where 'the State, although not soliciting false evidence, allows it to go uncorrected when it appears.'" *Dunlap V*, 155 Idaho at 389, 313 P.3d at 45 (quoting *Napue v. Illinois*, 360 U.S. 264, 269 (1959)). "[T]o establish a *Napue* violation a defendant must show '(1) the testimony was false; (2) the prosecutor should have known it was false; and (3) the testimony was material.'" *State v. Lankford*, 162 Idaho 477, 503, 399 P.3d 804, 830 (2017) (quoting *State v. Wheeler*, 149 Idaho 364, 368, 233 P.3d 1286, 1290 (Ct. App. 2010)).

The threshold for materiality is low with respect to a *Napue* claim. *Id.* at 506, 399 P.3d at 832–33. "For a *Napue* claim, evidence is material when 'there is *any* reasonable likelihood that the false testimony *could* have affected the judgment of the jury.'" *Id.* (quoting *United States v. Bagley*, 473 U.S. 667, 678 (1985)) (italics in original). "This is because [*Napue* violations] 'involve a corruption of the truth-seeking function of the trial process.'" *Sivak v. State*, 134 Idaho 641, 649, 8 P.3d 636, 645 (2000) (quoting *United States v. Agurs*, 427 U.S. 97, 104 (1976)). "While our

system of criminal justice is adversary[ial] in nature and the prosecutor is expected to be diligent and leave no stone unturned, he is nevertheless expected and required to be fair and has a duty to avoid misrepresentation of the facts[.]" *State v. Griffiths*, 101 Idaho 163, 166, 610 P.2d 522, 525 (1980), *overruled on other grounds by State v. LePage*, 102 Idaho 387, 630 P.2d 674 (1981); *see also Sivak*, 134 Idaho at 650, 8 P.3d at 645. Furthermore, "[t]he jury understands defense counsel's duty of advocacy and frequently listens to defense counsel with skepticism. A prosecutor has a special duty commensurate with a prosecutor's unique power, to assure that defendants receive fair trials." *United States. v. LaPage*, 231 F.3d 488, 492 (9th Cir. 2000).

First, we conclude the district court erred in finding that the testimony was not false because it failed to give deference to the trial court's determination that Hess's testimony was false. The district court reasoned:

> Hess indicated that N.O. told him she had family troubles, but denied "know[ing]" the nature of the trouble and denied "try[ing] to find out." As a detective, it is highly likely he understood the questions to ask whether he independently investigated what N.O. had told him about her family troubles. He had already testified that he had talked to N.O. about her family troubles. Thus, a jury would reasonably understand that he was aware of what N.O. said about her family troubles, but he did not know anything beyond what she told him and did not independently investigate it. If viewed in this sense, his testimony is not false; it is at most misleading, which is not sufficient to satisfy *Napue*.

(Bracketed language in original.) While the district court's reasoning holds some appeal, it was the trial court, not the district court, which observed Hess testify. In this situation—where our analysis is focused not on what the witness said, but on what the witness meant—the question of falsity is akin to the question of credibility. We generally defer to the observing court's determination in answering such questions. *See Lankford*, 162 Idaho at 506, 399 P.3d at 833. Here, the trial court was able to observe Hess's demeanor and hear the tone and cadence of his voice. The district court, like we, was constrained by the cold record. Thus, where there are multiple possible interpretations as to the meaning of a witness's statement, we hold that the observing court is entitled to deference.

Applying that deference here, we conclude that there was substantial and competent evidence to support the trial court's conclusion that Hess's testimony was false. When asked if he knew what N.O.'s family troubles were, Hess testified that he had "no idea." He did not say that he did not independently investigate N.O.'s claims, nor did he testify that he knew nothing other than what N.O. told him. Rather, he unequivocally stated that he had "no idea." Given his

43

conversation with N.O. about her family troubles, it necessarily follows that Hess must have had *some* idea what those troubles were, even if he did not know with any certainty. As such, we conclude the trial court's conclusion that Hess's testimony was false is supported by substantial and competent evidence.

We next address the materiality prong. Hall argues that, had the jury been aware that Hess's testimony was false, it would have impacted Hess's credibility. We disagree. During direct examination, Hess testified that, due to the passage of time between the 1991 rape and Hall's trial, he had had to review his old police reports and photos to prepare to take the stand. When asked by the prosecutor if he was "certain of all the details all these years later[,]" Hess stated, "Well, pretty much. You know, you can't be exactly 100 percent, but no, I do remember a lot about it." Thus, to the extent that Hess's false testimony reflects that he could not remember all the details of his investigation, the jury was already informed his memory was incomplete.

Additionally, to the extent that Hess's false testimony could reflect that his investigation was subpar, Hall's trial counsel adequately pursued that strategy during cross-examination. Hall's trial counsel successfully got Hess to admit that he had never tried to investigate N.O.'s family troubles, did not even know if N.O. was medicated when he questioned her about the rape, and did not know—nor did he try to find out—if N.O. had been tested for drugs or alcohol. Thus, if the jury was inclined to doubt Hess's credibility because of a subpar investigation, there was evidence with which to do so. In light of the testimony elicited from Hess on cross-examination, any evidence that Hess actually did discuss N.O.'s family troubles with her, as opposed to Hess having "no idea" what those problems were, would have simply been cumulative. Neither the trial court nor the district court erred in concluding that the testimony was immaterial. Accordingly, we are unpersuaded there was any reasonable likelihood the jury's judgment could have been affected by Hess's testimony.

Therefore, we conclude that Hall has failed to demonstrate the SAPD's performance prejudiced him because, even if the SAPD had raised it, his *Napue* claim would not have been successful on appeal. As such, the district court did not err in dismissing Hall's *Napue* claim.

> iv.  *The district court did not err in dismissing Hall's cumulative error claim.*

Hall also contended below that appellate counsel should have raised a cumulative error argument that included the post-conviction claims he asserts the SAPD should have raised on appeal. As we have concluded that none of Hall's asserted claims are meritorious, we hold that the

district court correctly dismissed the cumulative error claim. *See Perry*, 150 Idaho at 230, 245 P.3d at 982 ("[A] necessary predicate to the application of the doctrine is finding more than one error.").

### 4. The substantive claims

Finally, while Hall concedes the district court appropriately dismissed his substantive claims pursuant to Idaho Code section 19-2719 because the claims were untimely, Hall requests that this Court consider the claims "in an act of grace." The State responds that Hall has "fail[ed] to support his request with argument or authority" and further asserts that the claims are time-barred under section 19-2719.

This Court will not consider Hall's untimely substantive claims. Idaho Code section 19-2719(5) provides:

> If the defendant fails to apply for relief as provided in this section and within the time limits specified, he *shall* be deemed to have waived such claims for relief as were known, or reasonably should have been known. *The courts of Idaho shall have no power to consider any such claims for relief as have been so waived or grant any such relief.*

I.C. § 19-2719(5) (italics added). In enacting section 19-2719, the Legislature specifically forbade state courts from considering time-barred claims for post-conviction relief. *Id.* Hall has not provided any authority to the contrary. Therefore, we affirm the district court's dismissal of Hall's substantive claims.

## IV. CONCLUSION

For the foregoing reasons, we affirm the judgment of the district court.

Chief Justice BEVAN, Justices BRODY, MOELLER and BURDICK, J. Pro Tem, CONCUR.


## ON PETITION FOR REHEARING

After the release of this Court's original opinion on March 22, 2023, Hall petitioned this Court to rehear his case. In his petition, he challenged our conclusion that he had "waived any argument that the district court erred in declining to take judicial notice of the entirety of the records in his prior cases." Hall contends that, although this Court declined to consider portions of the records of his prior cases that were not judicially noticed by the district court, we nonetheless erroneously relied upon portions of the record that had not been judicially noticed. Specifically, he argues "the opinion makes statements about the videotaped interview between Detective Daniel Hess and the witness N.O." and "the opinion describes the broad discovery sought by post-

conviction counsel in the initial action." Hall asserts "both the videotaped interview and the relevant discovery motion fall outside the scope of Judge Hippler's narrow judicial-notice grants."

We disagree. The district court judicially noticed both the audio recording and transcript of Hess's interview with N.O. when it judicially noticed over one hundred exhibits that were included within Hall's final amended petition for post-conviction relief in his previous case. Additionally, the district court took judicial notice of the SAPD's "broad discovery request," filed on January 5, 2006, during the previous case. That motion for discovery contained the SAPD's request for discovery regarding Dr. Groben, DNA evidence, copies of FBI reports, the prosecution's communications with the media, and trial counsel's case load, as well as the discovery issues that the SAPD had appealed in *Hall I* and *Hall II* that had been briefly discussed by this Court in our March 22 opinion. *Hall I*, 151 Idaho at 44, 253 P.3d at 718 (discussing the January 5, 2006, motion for discovery); *Hall II*, 163 Idaho at 832–33, 419 P.3d at 1130–31 (discussing the "exhaustive thirty-one page Motion for Discovery").

We disagree with Hall's argument that we improperly relied on documents the district court had declined to judicially notice because the district court explicitly judicially noticed each of the documents Hall now challenges. (We acknowledge that our earlier opinion mistakenly referred to a "videotaped" interview between the witness identified as N.O. and detective Hess. The interview was audiotaped, not videotaped, but the audiotape was part of the record as was a transcript of Hess's interview with N.O. *See,* footnote 6, *supra.*) As such, Hall's argument in his petition that our "handling of judicial notice will now give rise to vexing questions in federal habeas proceedings" is unpersuasive. We deny Hall's petition for rehearing and, instead, submit this substitute opinion.

Chief Justice BEVAN, Justices BRODY, MOELLER and BURDICK, J. Pro Tem, CONCUR.